AUBURN NEWS COMPANY, INC., et al., Plaintiffs-Appellees,

v.

PROVIDENCE JOURNAL COMPANY, et al., Defendants-Appellants.

No. 81–1047.

United States Court of Appeals,
First Circuit.

Argued June 2, 1981.

Decided Sept. 23, 1981.

Joseph V. Cavanagh, Jr., Providence, R. I., with whom Edward F. Hindle, Edwards & Angell, Providence, R. I., Daniel C. Kaufman and Waddey, Lundin & Newport, Nashville, Tenn., were on brief, for defendants-appellants.

Frank Licht, Providence, R. I. and David L. Foster, New York City, with whom Richard A. Licht, Letts, Quinn & Licht, Providence, R. I., Howard C. Buschman, III, Richard L. Posen, Jack A. Pawa, Willkie, Farr & Gallagher, New York City, Austin T. Stickells, Boston, Mass., Leonard Decof and Decof & Grimm, Providence, R. I., were on brief, for plaintiffs-appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant Providence Journal Company (Journal) and its wholly-owned subsidiary, defendant-appellant Southern New England News Distributors, Inc. (SNENDI) appeal from a preliminary injunction of the District Court for the District of Rhode Island, enjoining them from refusing to deal with plaintiffs-appellees, eighteen independent wholesale newspaper distributors, and from using their customer lists. We vacate that part of the preliminary injunction enjoining appellants from not doing business with appellees. Because appellants apparently did not object to that part of the preliminary injunction forbidding them from using the customer list of appellees,[1] we do not review it on appeal.

The Journal, a privately-owned corporation in Rhode Island, publishes and circulates *The Providence Sunday Journal, The Providence Journal* (Monday-Friday morning newspaper), *The Evening Bulletin* (Monday-Friday afternoon newspaper), and the *Providence Journal Bulletin* (Saturday morning newspaper) throughout Rhode Island and southeastern Massachusetts. *The Evening Bulletin* is the only newspaper facing direct competition from other Rhode Island local papers. The Journal's subsidiary, SNENDI, distributes directly to store accounts and to home delivery carriers in parts of Rhode Island and southeastern Massachusetts. The Journal determines SNENDI policy and its circulation department employees directly supervise SNENDI personnel on a daily basis.

Appellees are sole proprietorships, family partnerships and family corporations which own and operate independent wholesale newspaper distribution businesses. They mainly purchase and resell Journal newspapers to home delivery carriers and store accounts in areas not directly covered by

---

1. In their brief and reply brief, appellants do not discuss this prohibition at all.

the Journal. During the week, most appellees do not distribute non-Journal newspapers. Two of the appellees supply less than three dozen copies of out-of-town newspapers (New York Times, New York News, Boston Globe and Boston Herald) on weekdays, and a third distributes 137 copies daily of the Attleboro Sun Times. On Sundays, appellees distribute out-of-town newspapers to their retailers. They and the Journal operate in geographically separate areas. Although such territorial division was not an explicit condition of the relationship between either the appellees and the Journal or among the appellees themselves, the arrangement was respected by all. The absence of price competition benefited the appellees.

The Journal distributed its paper through independent distributors until 1973. Its creation in that year of SNENDI with the object of directly entering the distributorship business was a marked shift from its prior reliance upon the independent distributors. At a breakfast of independent distributors called by the Journal in March 1973, its circulation director further emphasized the move towards an in-house distribution system; he announced that the Journal would purchase distributorships from those independents who wished to sell "at fantastic prices, starting at 100% increase above cost," rising "all the way to 800–900% and/or over," and that, in effect, it would not recognize the sale of distributorships, except to those who were part of the immediate family of the current distributors. This policy would thus foreclose the acquisition of new distributorships by independent wholesalers, and fortify the Journal's direct role in the distribution of its newspapers. In fact, the Journal did not always adhere to its new policy; it did do business with six

distributorships sold to third parties. But as an aftermath of the breakfast meeting, the Journal did acquire about thirty distributorships through SNENDI so that it had direct dealing with retailers accounting for 50% of the Journal's circulation.

In late 1979 or early 1980, the Journal sought to complete the change in its method of distribution. In a letter of August 11, 1980, it told all independent distributors that effective September 6, 1980, it would not sell its newspapers at wholesale rates to them. Direct sale and distribution of newspapers, the Journal explained, would result in a more efficient economical system and provide more uniform service to the readership. It also stated that it would be "pleased to discuss ... a reasonable offer for the purchase of ... subscriber lists of Journal newspapers" and that the offer of purchase would expire at the close of business on Friday, September 5, 1980. Fourteen of the thirty-two independent distributors with whom the Journal was then dealing sold out to it; appellees are the remaining eighteen distributors who did not. The Journal also informed store proprietors served by appellees that they "would be receiving [their] papers directly from the Providence Journal Company." In addition, the Journal placed advertisements in its newspapers informing home delivery carriers that they had to contact the Journal if they wanted to continue delivering Journal papers.

On September 2, 1980, the independent distributors brought suit challenging the direct distribution plan. They filed a thirteen-count complaint alleging that the Journal had conspired to restrain trade and destroy competition in violation of § 1 of the Sherman Act, 15 U.S.C. § 1,[2] and that it

**2.** 15 U.S.C. § 1 states:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall

be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

had monopolized and attempted to monopolize trade in contravention of § 2 of the Sherman Act, 15 U.S.C. § 2.[3] They also asserted parallel claims under the Rhode Island Antitrust Act, R.I.Gen.Laws §§ 6–36–1 *et seq.*, as well as common law claims of unfair competition and tortious interference with contractual relations. Plaintiffs' complaint prayed for treble damages and for interim and permanent injunctive relief. Together with their complaint, they filed a motion for a temporary restraining order, which the court below issued pending hearing and determination of the motion for preliminary injunction.

Discovery was expedited, but could not be completed because of the pressures of time. Nevertheless, numerous depositions were taken, extensive documentary evidence was produced, and the hearing on the preliminary injunction consisted of seven days of trial and a half day of argument. The district court heard fifteen witnesses, including four experts. It determined that the plaintiffs had demonstrated adequate grounds for issuance of a preliminary injunction—that they would suffer irreparable harm if defendants were not enjoined, that the balance of harm tipped in the direction of the plaintiffs, that they established a public interest requiring preliminary relief, and that they produced credible evidence which, if accepted at the hearing on the merits, would result in ultimate success. The court employed the "alternative test" standard enunciated in the Second Circuit, *see, e. g., U. S. v. Bedford Associates*, 618 F.2d 904, 912 n.15 (2d Cir. 1980), that the plaintiff need not make as persuasive a showing that he is likely to succeed on the merits where other factors are strong, such as the potential harm to plaintiff and the lack of a similar potential for harm to defendant. In granting the injunction, the district court rejected treble damages as an adequate remedy at law, con-

cluding that such an award (1) would convert litigation "into a kind of private eminent domain proceeding" in which the Journal would "have purchased Plaintiffs' businesses, at a price determined by the Court"; (2) would fail to recognize the interests of the many retailers not party to the action; and (3) would obstruct "the lofty purpose of the Sherman Act." In its order entered December 23, 1980, the district court enjoined the Journal *pendente lite* from "refusing to deal with plaintiffs and from using plaintiffs' customer lists"; plaintiffs were required to post a $30,000 bond without surety.

Before this court, appellants argue that the district court erred as a matter of law in granting the preliminary injunction by not requiring that plaintiffs show a probability of success on the merits; that plaintiffs, contrary to the district court's determination, had an adequate remedy at law; and that the district court, in effectively enjoining the Journal's conversion to a direct wholesale distribution system, misapplied fundamental antitrust principles, and failed to accept the Journal's valid business reasons for the conversion to a direct distribution system.

■ We begin by observing that private parties may be afforded preliminary injunctive relief in antitrust cases

> when and under the same conditions and principles as injunctive relief . . . is granted by courts of equity, . . . and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that
>
> the danger of irreparable loss or damage is immediate.

15 U.S.C. § 26. We, therefore, briefly review our standard for granting a prelimi-

---

**3.** 15 U.S.C. § 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony,

and, on conviction thereof, shall be punished by fine not exceeding one million dollars, if a corporation, or if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

nary injunction. We adhere, of course, to the basic requirement, which originated centuries ago in the English Court of Chancery, that before such relief becomes available there must be a showing that there is no adequate remedy at law. In addition, we reiterate that

> "[i]n the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction."

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981), *quoting Women's Community Health Ctr., Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979) (citations omitted). "Application of these standards to a particular set of facts is not a mechanical process." *Nat. Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 823 (1st Cir. 1979). None of these criteria should be slighted. The moving party must exhibit a likelihood of success on the merits; indeed, the probability-of-success component has loomed large in cases before this court. *See, e. g., Planned Parenthood League v. Bellotti*, 641 F.2d at 1009–1022; *Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d 712 (1st Cir. 1979); *Grimard v. Carlston*, 567 F.2d 1171 (1st Cir. 1978).

■ At the stage of appellate review, the "decision to grant or deny a preliminary injunction . . . is reversible . . . only for an abuse of discretion. It is also well settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion." *Planned Parent-*

*hood League v. Bellotti*, 641 F.2d at 1009, *quoting Charles v. Carey*, 627 F.2d 772, 776 (7th Cir. 1980) (citations omitted).

■ We assess the particular claims in the case at hand in terms of two analytically distinct periods—before and after August 11, 1980, when the Journal announced its intention in a letter to distributors to assume total control of the distribution system. In our view the action taken in each period has different antitrust consequences. With respect to conduct before the August 11 notice, the independent distributors allege that the Journal combined with SNENDI to price-fix and that the Journal coerced them to combine with it to do the same as well. In the course of a hearing on the preliminary injunction, independent distributors testified that the Journal's approval of them as franchisees was tacitly contingent upon their agreeing to the Journal's suggested retail price; some claim to have suffered late deliveries when they raised the price of the papers to their carriers; and some testified that they were told that they could not raise the price of their papers to meet increased costs of distribution. To be sure, maximum price-fixing is per se illegal, *Albrecht v. Herald Co.*, 390 U.S. 145, 151–53, 88 S.Ct. 869, 872–873, 19 L.Ed.2d 998 (1968). But however strong appellees case may be on the merits with respect to the Journal's conduct before the August 11 letter, they cannot secure preliminary injunctive relief unless they can show that an adequate remedy at law is not present. Their injury may be substantial, but we are not persuaded that such remedy—treble damages—is inadequate. Section 4 of the Clayton Act provides for such an award to any person "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. It seems to us that if the independent distributors prevail on the merits of their claims, they should be able to demonstrate actual and measurable injury to their businesses or properties was caused by the antitrust violations; the remedy of treble damages would therefore be entirely adequate.

■ We consider next appellant's behavior after August 11, as indicated in its letter of that date. Appellees contend that the Journal's decision to assume completely the distribution function was anticompetitive and in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. In essence, appellant decided to vertically integrate downstream—that is, to undertake the distribution of its products which had been and could be sold to independent producers or distributors. 3 P. Areeda and D. Turner, *Antitrust Law* ¶ 724, at 195 (1978). Vertical integration may come in a variety of forms with different impacts on economic performance.[4] Where substantial market power is absent at any one product or distribution level, vertical integration will not have an anticompetitive effect. Vertical integration by a monopolist, however, can have adverse consequences on competition because monopoly at one level of the production-distribution continuum may carry with it the ability to affect competition in earlier or later phases. Moreover, the lack of competition may have negative effects on efficiency and progressiveness. *See* F. M. Scherer, Industrial Market Structure and Economic Performance 405 (1970). But vertical integration can also result in economic advantage to society. It can result in savings in market transaction costs and production economies. New efficiencies and innovations may ultimately yield lower prices on the end product. Integration can thus be a good faith effort to do business in more efficient ways.

Any assessment of vertical integration must take into account the variables present in the particular situation. As the Supreme Court stated, it is "clear . . . that vertical integration, as such without more, cannot be held violative of the Sherman Act. . . . [T]he extent of permissible integration must be governed, as other factors in Sherman Act violations, by the other circumstances of individual cases." *United States v. Columbia Steel Co.*, 334 U.S. 495, 525–26, 68 S.Ct. 1107, 1123, 92 L.Ed. 1533

(1948). In the specific context of the case before us, we cannot see how the kind of vertical integration at issue—integration into distribution—violates the antitrust laws. Appellants seek to better control and market their product by changing their distribution structure. *See, e. g., Naify v. McClatchy Newspapers*, 599 F.2d 335, 336 (9th Cir. 1979); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 805 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). They assert that the direct system would result in uniformity of sales, service and promotion across the market. Their experts testified that newspapers secure most of their revenue from advertising, that implementation of the direct wholesale distribution system, by enabling the Journal to build its distribution base, would enhance its ability to attract and retain advertisers. The objectives of appellants, as witnesses testified, were sometimes in conflict with appellees' goal of maximizing profits on the sale of newspapers. It was appellees, not appellants, who sought to charge higher prices to consumers, and it must not be forgotten that it is ultimately consumers whom the antitrust laws are designed to protect. This case, moreover, is not one in which vertical integration would drive out competition; appellees concede that they do not compete among themselves. The core of the distributors' case is that they cannot remain in business on the revenues secured from the sale of non-Journal publications. While this is unfortunate for them, we cannot mandate that the Journal, in effect, bear the distribution costs of its competitors by maintaining the old distribution network.

With respect to all antitrust claims made under state law, we reach the same results, observing simply that Rhode Island law provides that its antitrust statutes "be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." R.I.Gen.Laws § 6–36–2(c) (Supp.1980).

*Reversed and remanded.*

---

4. The literature on vertical integration has become quite substantial. For an overview of the different approaches, *see, e. g.*, Kaserman, Theories of Vertical Integration: Implications for Antitrust Policy, 23 *Antitrust Bulletin* 483 (1978).