Rosemary BELFIORE, et al., Plaintiffs,

v.

The NEW YORK TIMES COMPANY, et al., Defendants.

Louis GUIMOND, Plaintiff,

v.

The NEW YORK TIMES COMPANY, Defendant.

Civ. A. Nos. B–82–554 (RCZ), B–82–242 (RCZ).

United States District Court, D. Connecticut.

Dec. 23, 1986.

844

Peter Hearn, Pepper, Hamilton & Scheetz, Philadelphia, Pa., J. Daniel Sagarin and William B. Barnes, Hurwitz & Sagarin, Milford, Conn., Richard M. Rindler, Arthur M. Adelberg and Robert J. Dominguez, Pepper Hamilton & Scheetz, Washington, D.C., Peter G. Eikenberry and Marilyn B. Fagelson, New York City, for plaintiffs in Belfiore case.

Lawrence W. Iannotti and Ronald J. Cohen, Tyler Cooper & Alcorn, New Haven, Conn., Dennis McInerney, Charles Platto and Patricia Farren, Cahill Gordon & Reindel and George Freeman, New York Times, Co., New York City, for New York Times Co.

John Lee, New Haven, Conn., for Callcenter Services, Inc.

Alan Neigher and Judith M. Trutt, Westport, Conn., for plaintiff Guimond.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ZAMPANO, Senior District Judge.

### FACTS

The plaintiffs, independent newspaper delivery dealers, instituted this private antitrust action against the New York Times Company ("the Times") when it expanded its "T–Route" system of direct home delivery of newspapers into Fairfield County, Connecticut.[1]

### I.

For over fifty years, delivery of the Times' newspaper in Fairfield County was available only through independent route dealers such as plaintiffs.[2] The indepen-

---

1. The *Guimond* suit was filed prior to the *Belfiore* suit, after the Times began T-Route delivery in the area of a single Fairfield County dealer, Louis Guimond. For purposes of this motion, plaintiff Guimond has adopted the *Belfiore* plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

2. The admitted sponsor and orchestrator of this litigation is the Metropolitan Routedealers Association ("MRA"), a trade association. Since at least 1977, the MRA has been amassing a "legal fund" to challenge the Times should it ever attempt to modify or eliminate the independent dealer system of home delivery. *See* Dep. of B. Hochhauser, President of the MRA, at pp. 452–

dent dealers purchased the newspapers from wholesalers and, in turn, resold the newspapers to their home delivery customers. The Times held no ownership interest in the wholesalers' or independent dealers' businesses.

In September 1982, due to what the Times asserts were legitimate business reasons stemming from a four-year decline in home delivery circulation, the Times extended its T–Route system of newspaper distribution into the areas of Fairfield County previously served by the independent dealers. Under the T–Route distribution system, the Times' newspapers are delivered to home subscribers without the intermediate assistance of the independent dealers.

The plaintiffs contend that this expansion of the Times' T–Route system constitutes unlawful conduct which irreparably harms the independent dealers. While conceding they can still purchase and deliver the Times' newspaper to their customers, they point out that the Times no longer refers new subscribers to them and offers lower prices to subscribers who accept T–Route delivery. These practices, it is argued, make it impractical for them to compete against the T–Route system and soon they will be out of business.

The Amended Complaint, seeking damages and injunctive relief, alleges five

counts under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2: Section 1 price fixing (Count 1); Section 1 restraint of trade (Count 2); Section 2 monopolization (Count 3); Section 2 attempted monopolization (Count 4); and Section 2 conspiracy to monopolize (Count 5).[3] Specifically, plaintiffs seek to prohibit the Times from using any persons or businesses other than themselves or other independent dealers to provide home delivery of the Times' newspaper in Fairfield County, and to enjoin the Times from providing home delivery of its product at a price below that which the plaintiffs can provide.

## DISCUSSION

The central issue in this suit is the legality under Sections 1 and 2 of the Sherman Act of the Times' decision to modify its distribution system to provide direct home delivery in areas previously served exclusively by the independent dealers. In light of the absence of any genuine issue of material fact, *see Combustion Engineering, Inc. v. Consolidated Rail Corp.,* 741 F.2d 533, 536 (2 Cir.1984); Fed.R.Civ.P. 56(c), and the line of federal cases which have upheld the right of newspaper publishers to assume responsibility for all or part of the retail distribution of their products,[4] summary judgment in favor of defendants is granted.[5]

460 and Hochhauser Exhibits 15 & 47. The MRA's objective, as summarized by one Fairfield County dealer who chose not to be a plaintiff, is "getting the Times to get the hell out of my area." D. Young Dep. at p. 317.

**3.** Four pendent state claims are also alleged: unfair methods of competition under the Connecticut Unfair Trade Practices Act, Conn.Gen. Stat. § 42–110b *et seq.* (Count 6); violation of the Connecticut Antitrust Act, Conn.Gen.Stat. § 35–26 *et seq.* (Count 7); violation of the Connecticut Franchise Act, Conn.Gen.Stat. § 42–133e (Count 8); and tortious interference with contract (Count 9). In light of the resolution of the present motion, the Court need not address their merits.

**4.** *See e.g., Paschall v. Kansas City Star Co.,* 727 F.2d 692, 704 (8 Cir.) (*en banc*), *cert. denied,* 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984) ("[W]e find it hard to ignore that every other antitrust case brought against a newspaper publisher challenging the newspaper's deci-

sion to forwardly integrate into distribution has been resolved in favor of the newspaper").

**5.** In *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the Supreme Court stated that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." However, later in *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court made it clear that Fed.R.Civ.P. 56(e) should not be read out of antitrust cases. While recognizing the importance of preserving litigants' rights to a trial on their claims, the Court was "not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to

*Section 2 Abuse of Monopoly Power*

Plaintiffs claim that the Times possesses monopoly power in the publication of daily newspapers in various geographic markets. These areas allegedly include Fairfield County, Connecticut, and the New York City metropolitan area. More specifically, in the course of an issue-definition process before a Court-appointed Special Master, plaintiff defined the relevant market for the Times' alleged publishing monopoly as "general interest daily newspapers directed primarily to upscale readers," and defined "upscale" readers as those meeting two or more of the following criteria: total household earnings of $35,000 or more, a college degree, and/or a professional/managerial type job. Plaintiffs further contend that the Times is using its alleged monopoly in the publishing market to gain a competitive advantage in the newspaper home delivery market. Abuse of monopoly power under Section 2 of the Sherman Act[6] has two elements:

1) the possession of monopoly power in the relevant market; and

2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268, 275 (2 Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). As the second element makes clear, "[t]he mere possession of monopoly power does not *ipso facto* condemn a market partici-

pant." *Berkey*, 603 F.2d at 275. Rather, a Section 2 violation requires improper or anticompetitive use of monopoly power.

Plaintiffs have failed to convince this Court that any genuine issue of material fact exists with regard to the requisite elements of an abuse of monopoly claim. First, plaintiffs have not asserted facts to support a finding that the Times has a publishing monopoly in a legally cognizable market. As defendants point out, plaintiffs "upscale readers" market definition is highly reminiscent of the " 'strange red-haired, bearded, one-eyed man-with-a-limp classification' " criticized by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 457 n. 4 (2 Cir.1974).

■ Obviously, the narrower the market defined by plaintiffs, the easier it is to show possession of monopoly power in the relevant market. Plaintiffs' attempt to define the relevant market "from the product out" is rejected. The natural monopoly every manufacturer has in the production and sale of its own product cannot be the basis for antitrust liability. *Norridge News Agency, Inc. v. Chicago Tribune Co.*, 1983–2 CCH Trade Cas. ¶ 65,672 (N.D.Ill. 1983); *Neugebauer v. A.S. Abell Co.*, 474 F.Supp. 1053, 1059, 1062–64 (D.Md.1979). Similarly, plaintiffs' attempt to define the relevant market by virtue of the demographic profile of just some of its readers is legally insufficient.

■ Second, the hallmark of monopoly power is the "power to control prices or exclude competition." *Paschall v. Kansas City Star Co.*, 727 F.2d at 692, 695–96 n. 2. (8 Cir.) (*en banc*), *cert. denied*, 469 U.S.

---

support the complaint." *Id.* at 288–90, 88 S.Ct. at 1592–93. In *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court has reinforced the message of *Cities Service* that summary judgment is appropriate "if the factual context renders respondents' claim implausible —[and] if the claim is one that simply makes no economic sense...." *Id.* at 1356. In accordance with this reasoning, the Second Circuit has affirmed the grant of summary judgment in antitrust cases. *Reborn Enter., Inc. v. Fine Child, Inc.*, 754 F.2d 1072 (2 Cir.1985); *Triple M. Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242 (2 Cir.

1985); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832 (2 Cir.1980); *Modern Home Inst., Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102 (2 Cir.1975).

In a separate opinion filed this date the Court has denied the plaintiffs' motion to file a second amended complaint.

**6.** Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire ... to monopolize" any part of interstate or foreign commerce.

872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984). Plaintiffs concede that among general circulation newspapers, the Times' newspaper is not dominant: the New York Daily News has the largest newspaper circulation in the New York metropolitan area, and sales of the New York Post may be at least equal to those of the Times' newspaper. This admission belies any finding that the Times is a monopolist, even under plaintiffs' contrived market definition.

■ Third, even if the Times enjoys a publishing monopoly in a legally cognizable market, plaintiffs' monopolization claim must fail. Vertical integration by monopolists can have procompetitive effects that are not violative of the Sherman Act. Unreasonable, anti-competitive actions must be distinguished from the valid exercise of business judgment in an effort to protect investments. Established law dictates that vertical integration into distribution by a monopolist publisher, even in refusal to deal cases, does not, without more, offend Section 2 of the Sherman Act.[7] *See, e.g., Paschall v. Kansas City Star Co.,* 727 F.2d 692 (8 Cir.) (*en banc*), *cert. denied,* 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); *Becker v. Egypt News Co.,* 713 F.2d 363 (8 Cir.1983); *White v. Hearst Corp.,* 669 F.2d 14 (1 Cir.1982); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273 (1 Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9 Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Norridge News Agency Inc. v. Chicago Tribune Co.,* 1983–2 CCH Trade Cas. ¶ 65,672 (N.D.Ill. 1983); *Neugebauer v. A.S. Abell Co.,* 474 F.Supp. 1053 (D.Md.1979); *Lamarca v. Miami Herald Publishing Co.,* 395 F.Supp. 324 (S.D.Fla.), *aff'd mem.,* 524 F.2d 1230 (5 Cir.1975).

As stated by the Court of Appeals for this Circuit in *Berkey Photo:*

... the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market. It is the use of economic power that creates the liability. But, as we have indicated, a large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantage of its broad-based activity—more efficient production, greater ability to develop complementary products, reduced transaction costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.

603 F.2d at 276.

The thrust of the plaintiffs' position is that the Times is abusing its alleged publishing monopoly by placing itself in direct competition with the independent dealers. Thus, it is argued, that the vertical integration is a convenient device for "leveraging" from a monopoly at one stage of production to a monopoly in another. *See* R. Posner and F. Easterbrook, *Antitrust,* 869–76 (1981); *Berkey,* 603 F.2d at 275. To avoid such a supposedly illicit result, plaintiffs contend that the Times should charge lower prices to wholesalers who in turn would pass on the savings to independent dealers, or alternatively the Times should charge higher prices at the retail level.

However, the Times is not required to subsidize or guarantee the profitability of independent route dealers to avoid antitrust liability. The antitrust laws "were enacted for the protection of *competition,*

---

**7.** As argued by defendants, allegations of interference with deliveries, disparagement and misinformation made at the outset of this litigation have not been substantiated, and plaintiffs have admitted that whatever problems may have existed at the start-up of the T-Route expansion have long since been alleviated. Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 32 n. 16, and citations therein.

not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and "[w]e must always be mindful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition." *Berkey*, 603 F.2d at 273. Plaintiffs have made no showing of an impact upon competition, as opposed to an impact on themselves, sufficient to transform the Times otherwise legitimate business activities into an antitrust violation.

### Section 2 Attempt to Monopolize

Plaintiffs also claim that defendants have attempted to monopolize the sale of home delivered morning newspapers, particularly its own newspaper, in Fairfield County, Connecticut. Success on this claim depends on a showing of both (1) a specific intent to achieve monopoly power, and (2) a dangerous probability of successful monopolization of a relevant market. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d at 832, 841 (2 Cir.1980).

A newspaper publisher's vertical integration into retail distribution does not, standing alone, provide evidence of a specific intent to monopolize, even if it is accomplished (unlike in the instant case) in a manner that will eliminate sales by independent dealers. *See, e.g., Auburn News*, 659 F.2d at 278. Moreover, liability based on specific intent can be negated where valid business justifications exist. *See United States v. Paramount Pictures,*

*Inc.*, 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260 (1948); *Paschall*, 727 F.2d at 697.

The Times has presented unchallenged, legitimate business reasons for the modification of its distribution system and the expansion of its direct home delivery routes. During the four years prior to this decision, daily home delivery sales declined steadily from a high of approximately 249,-100 to a low of 232,500. *See* April 3, 1985 Aff. of R. Lewis (Sr. V.P.—Circulation of the Times newspaper division) ¶ 7. It is beyond dispute that a newspaper publishers' profits are, at least in significant part, a function of advertising revenue which, in turn, depends on circulation volume. *See* P. Areeda, *Antitrust Law* § 729.7a at 197–98 (1982 Supp.).[8] Indeed, the Times asserts that its sale of advertising accounts for more than 80% of its revenues. Clearly, sound business judgment supported the Times' action in 1982 to reverse the decline in its home delivery circulation. Further belying any specific intent by the Times to monopolize the home delivery market in Fairfield County are the uncontested facts that the Times did not increase its wholesale prices or refuse to deal with plaintiffs.

■ Even if plaintiffs were successful in raising material factual issues on the specific intent element, their attempt to monopolize claim must fail because of the absence of any proof of a dangerous probability that the Times will monopolize any

---

**8.** Professor Areeda interprets the controversy regarding publisher's vertical integration as follows:

> The antitrust controversy arises when the publisher decides to shift to self-wholesaling or self-retailing. There have been several motives for doing so. Perhaps most important is the publisher's conclusion that his circulation goals are not fully shared by an independent wholesaler. The latter's profits are entirely a function of his wholesale-retail margin and his volume, while the publisher's profits are a function both of (1) the wholesale price, publication cost, and volume of newspapers sold and (2) advertising revenue, which also depends upon circulation volume. This means that increased circulation volume is more

> valuable to the publisher than to the dealer.... The implications are two-fold. The publisher has a greater incentive (1) to assure higher quality service to subscribers than an independent distributor and also (2) to eliminate any excess costs or margins at the distribution levels. Moreover, because the distributors do not compete with each other, there is no market pressure on the dealers to hold their margins down and service up. Of course, the publisher might attempt to supervise the dealer's service by contract, but precedent condemns the contractual limitation of maximum prices. The publisher may therefore conclude that self-distribution would improve service and minimize prices to subscribers.

relevant distribution market.[9] Proof that independent dealers of the Times' newspaper may be eliminated as a result of the Times' vertical integration would not satisfy the "dangerous probability" element. *See Auburn News*, 659 F.2d at 278; *McDaniel v. Greensboro News Co.*, 1984–1 CCH Trade Cas. ¶ 65,792 (M.D.N.C.1983); *Norridge News*, 1983–2 CCH Trade Cas. ¶ 65,672. Moreover, the Times' vertical integration is not likely to drive out competition because plaintiffs concede that they do not compete among themselves. Finally, as stated in *Auburn News:*

> The core of the distributors' case is that they cannot remain in business on the revenues secured from the sale of non-Journal publications. While this is unfortunate for them, we cannot mandate that the Journal, in effect, bear the distribution costs of its competitors by maintaining the old distribution network.

659 F.2d at 278.

The *McDaniel* case is instructive insofar as the court granted summary judgment for the publisher on plaintiff's attempt to monopolize claim where the plaintiff had defined an extremely narrow market—one in which it was the only independent dealer—and where there was evidence of the publisher pursuing vertical integration "in a harsh manner." *See* n. 7, *supra*. The Court found that the presence of competing newspapers even in the narrow market defined by plaintiff precluded a finding of dangerous probability.

> [W]ithout monopoly power or a dangerous probability thereof or some such adverse effect on competition, and not just on plaintiff as a competitor, the integration does not violate antitrust laws. The presence of the Eden Daily News, which has a greater circulation than the

Greensboro Daily News, and the several other local newspapers in the alleged market belies any notion of monopoly power or dangerous probability of monopoly power in the distribution of newspapers.

1984–1 CCH Trade Cas. at 67,286. *See also Norridge News*, 1983–2 CCH Trade Cas. at 69,438 (fact that defendant did not interfere with plaintiffs' sales of other newspapers when it eliminated sales of its own newspaper to plaintiff was found to be inconsistent with an attempt "to corner distribution of other dailies").

In the case *sub judice*, the indisputable fact is that the Times accounts for less than 15% of daily newspaper circulation in Fairfield County. *Circulation, 1984–1985* (Twenty-third Annual Circulation and Penetration Analyses of Print Media). Moreover, it is uncontested that the Times has not interfered with plaintiffs' sales of competing newspapers. As defendants' point out, even if all independent dealers of the Times' newspaper in Fairfield County served by Standard News were eventually eliminated, plaintiffs could not show an actionable affect on the newspaper market as a whole. In today's marketplace, many of the Times' competitors in the Fairfield area handle retail sales directly and do not rely on sales through independent dealers. Defendants' Memorandum of Law at 49. Because T–Route carriers are permitted to carry newspapers other than the Times' newspaper, *id.*, the expansion of T–Routes has actually increased the number of carriers available to distribute competing newspapers.

Plaintiffs have failed to raise issues of material fact under either prong of the attempt to monopolize test, therefore, this count of their complaint also fails.

---

9. In an April 26, 1984 letter from A. Adelberg to the Special Master, plaintiffs more specifically defined the alleged market for this count as "the home delivery of morning newspapers in that portion of Fairfield County served by [wholesaler] Standard News Company." Because, even under the plaintiffs narrowly defined market, the Court finds that the second element of an

attempt to monopolize claim is not satisfied, the Court need not reach the issue of whether this definition constitutes a legally cognizable market. *See, e.g., Neugebauer*, 474 F.Supp. at 1062 (rejecting argument that home delivery was separate market because it turned "on *how* defendant Abell distributed its product rather than on the nature of what was being distributed").

*Section 1 Conspiracy in Restraint of Trade and Section 2 Conspiracy to Monopolize*

■ Two counts of conspiracy are alleged by plaintiffs. They contend that the defendants, in combination with their co-conspirators (wholesalers and operators of T-Routes), have unreasonably restrained trade in the sale of home delivered newspapers, and, particularly, the Times' newspaper. They further contend that the Times and defendant CSI[10] have combined and conspired to monopolize the sale of home delivered morning newspapers, and particularly the Times, in Fairfield County. These claims also must fail as a matter of law. Concerted action between two or more distinct economic entities is an essential element of a Section 1 violation and a conspiracy to monopolize in violation of Section 2. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1031 (2 Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979).

■ The Times relies on the assistance of telephone and delivery personnel to handle incoming calls, customer solicitation and newspaper distribution on a fee basis. Delivery to individual households is made by carriers, who are paid a per-paper fee for delivery and bear no risk of loss with respect to T-Route sales. The newspapers are transferred in bulk to the carriers by wholesalers, who also are compensated on a per-paper basis and bear no risk of loss.

CSI works under contract to the Times to respond to incoming customer calls, and one or more telephone soliciting companies work under contract to offer home delivery to prospective customers. Finally, the Times relies on an outside computer company to handle billing and collections. It is beyond dispute that any of these entities participated in the Times' decisions regarding T-Route expansion or pricing and promotions.

None of these agents[11] has the legal capacity to conspire with the Times. As stated in *Fuchs:*

> [I]f it is not an antitrust violation for a manufacturer to change his distribution system, then it can hardly be evidence of an illegal conspiracy that the manufacturer seeks merely to secure the personnel to man this new system.

602 F.2d at 1031.

Even if plaintiffs could prove that the Times' agents had the capacity to conspire with the Times itself or played an independent role in the Times' expansion, their proof fails on the concerted action element of their conspiracy claim. There is no significant probative evidence that defendants shared a conscious commitment to an illegal scheme or the specific intent to achieve monopoly power. *See Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984).

Additionally, there is no evidence in the record that any agent of the Times was privy to its decisions as to policy and T-

---

**10.** Callcenter Services, Inc. ("CSI," sued as MCI Corporation), which serves as the "telephone agent" for the Times, is also a defendant in this suit.

**11.** Whether two actors constitute distinct economic entities for purposes of a Sherman Act violation is determined by the economic realities of their relationship. *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 801–02 (9 Cir.1976). As noted in *Fuchs,* in the context of a principal/agent relationship this analysis requires consideration of a number of elements, including: whether the agent performs a function on behalf of his principal other than securing an offer from a buyer for the principal's product;

the degree to which the agent is authorized to exercise its discretion concerning the price and terms under which the principal's product is to be sold; and whether use of the agent constitutes a separate step in the vertical distribution of the principal's product. If an actor is merely a "conduit" for another actor, there is not a Sherman Act violation. 602 F.2d at 1031 n. 5.

Review of these criteria in the case *sub judice* reveals that those entities described above were merely agents employed by the Times to implement its expanded system of direct distribution. *See* Amended Complaint ¶¶ 12, 13 (using "agents" characterization).

Route expansion. Plaintiffs allege that employees of CSI gave misinformation when responding to one or two sham inquiries from independent dealers pretending to be customers, and that wholesalers discriminated in favor of T-Routes in terms of timing and priority of bulk newspaper deliveries. However, even if true, these incidents do not constitute significant probative evidence of complicity in an illegal scheme. *See Cities Service*, 391 U.S. at 289, 88 S.Ct. at 1592–93; *Zenith*, 475 U.S. at ——, 106 S.Ct. at 1357 ("[plaintiff] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiff]").

 Finally, as noted above, a publisher's vertical integration does not violate antitrust law, absent proof that it "was intended to or did bring about some restraint of trade beyond the loss of business suffered by a distributor or the market's loss of a distributor–competitor." *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9 Cir.1976). As defendants' point out, this principle is consistent with the general rule in this Circuit that a conspiracy that reduces intrabrand competition does not violate Section 1 unless there is an anticompetitive effect on the industry as a whole. *See, e.g., Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 130 n. 5, 133–34 (2 Cir.) (*en banc*), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). As discussed in connection with plaintiffs' attempt to monopolize claim, there is no evidence that the Times, through its T-Route expansion, intended to or did accomplish a restraint on the distribution of newspapers.

*Section One Price Fixing*

Plaintiffs allege that for at least four years prior to their filing the complaint in this action, the Times engaged in vertical price fixing through coercion in violation of Section 1.[12] They allege that the Times threatened to injure their businesses if they failed to follow its pricing demands and that their prices were generally depressed by an overall "atmosphere of coercion" as a result of comments and conduct on the part of the Times.

The combination required under Section 1 must be demonstrated by proof of:

(1) an express or implied agreement, or

(2) the securing of actual adherence to prices by means beyond mere refusal to deal.

*Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52 (2 Cir.1980); *see also, Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964) ("a supplier may not use coercion on its retail outlets to achieve resale price maintenance"). Plaintiffs have not raised issues of fact material to the essential elements of coercion and price adherence.

 Evidence of pricing suggestions, conversations, arguments, or pressure is not sufficient to establish coercion. *Yentsch*, 630 F.2d at 53. Rather, evidence of threats or other explicitly coercive conduct is required. The admissions contained in the deposition testimony of the plaintiffs contradict the allegations of the Amended Complaint and confirm that the Times did not suggest a home delivery price (other than a promotional price for a stated introductory period for customers referred to independent dealers by the Times).[13] Furthermore, the plaintiffs were not coerced or threatened by the Times with respect to

12. Section 1 of the Sherman Act states:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

13. As noted by defendants, plaintiffs' counsel agreed in the course of the issue definition process before the Special Master, that to make out a vertical price fixing claim "[i]t is insufficient

for a plaintiff to show that participation in a generally available market promotion of [the Times' newspaper] was conditioned by [the Times], acting independently, upon a dealer's compliance with the terms and conditions of the promotion, including price reduction, or that it would be unavailable to the dealer who did not adhere to the price." Report of Special Master, August 11, 1984, p. 17, ¶ 14.

their pricing.[14] *See* Defendants' Memorandum at 60–63, and deposition citations contained therein.

Similarly, evidence obtained through plaintiffs' deposition testimony and interrogatory answers defeats their claim that they formed a combination with the Times by unwillingly adhering to prices set by it. *See* Defendants' Memorandum at 64–65, and discovery citations contained therein. This evidence reveals a wide disparity among the prices charged by the independent dealers for home delivery during the relevant period, rather than a uniform price, and also reveals that the independent dealers' prices were substantially in excess of the Times' prices.[15]

In view of this admitted absence of adherence to any uniform price fixed by the Times, even if plaintiffs' could substantiate their counsel's charge that the Times attempted to fix their prices by "threats, coercion and a pattern of intimidation," the law of this Circuit dictates a ruling in defendants' favor on the price fixing count. As stated by Judge Sofaer in *Reborn Enterprises,* and later affirmed by the Second Circuit

> For Reborn to avoid summary judgment on its price-fixing claim it must advance sufficient evidence to raise a genuine dispute as to whether defendants engaged in coercive activity to force adherence to its suggested retail price and plaintiff and other retailers actually adhered to that price....

Plaintiff has failed to raise a genuine dispute as to whether anyone adhered to the suggested price. The depositions of the various store owners reveal that several, including Ben's, Albee's, and Schneider's, sold above the suggested retail price, while at least two, Hatzlacha and Darlings, sold below it. These companies represented approximately half of the MacLaren accounts in New York. 590 F.Supp. at 1439.[16]

Finally, plaintiffs' attempt to make out a Section 1 violation by claiming that a so-called "atmosphere of coercion" prevailed throughout the New York metropolitan area over the past several years and created an unspecified downward pressure on prices, also must fail. Even if plaintiffs could show that their prices were generally depressed, their proof, as a matter of law, does not support a finding that an atmosphere of coercion existed. Plaintiffs' atmosphere of coercion theory is, rather, a thinly disguised complaint that potential competition through vertical integration and promotional programs established by the Times impinged on the independent dealers' ability to exact whatever prices they chose.

■ The case law, however, makes clear that advertising of discount prices does not constitute coercion by a supplier even if such advertising causes an independent dealer's customers to expect or demand a lower price. *Jack Walters & Sons, Corp. v. Morton Buildings Inc.,* 737 F.2d 698, 707–09 (7 Cir.), *cert. denied,* 469 U.S.

**14.** Plaintiff Blakeslee maintained in his deposition that he received direct threats on nearly every aspect of his business from every person in the Times' Circulation Department involved in home delivery in his area. *See* Blakeslee Dep. pp. 241, 728, 729. Even if this testimony were believable, it would not, standing in contrast to the overwhelming evidence in the record demonstrating the absence of coercion, be sufficient to defeat summary judgment. *See Reborn Enter., Inc. v. Fine Child, Inc.,* 590 F.Supp. 1423, 1440 (S.D.N.Y.1984) (one dealer's deposition testimony that he was threatened was insufficient to defeat summary judgment), *aff'd,* 754 F.2d 1072 (2 Cir.1985).

**15.** For example, at the start of T-Route expansion, full-week service from a T-Route for a

four-week period cost $16.00, while plaintiffs' prices for the same service ranged from more than $19 to almost $26.

**16.** The Second Circuit in *Yentsch* made clear what degree of "coercion" must be present to prevail on a price fixing claim:

> While evidence of exposition, persuasion, argument, or pressure is alone insufficient to establish coercion ... threats of termination, as long as they secure adherence to the fixed price, have been deemed to trespass beyond the boundaries of *Colgate,* thereby triggering a finding of an illegal combination.
> 630 F.2d at 53.

1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984). Some other, entirely legal, competitive market force may keep the dealers from raising their prices. Moreover, a dealer's concern, albeit normal, about possible vertical integration by its publisher is not actionable under the Sherman Act. *See Northwest Publications, Inc. v. Crumb*, 752 F.2d 473, 476 (9 Cir.1985); *Newberry v. Washington Post Co.*, 438 F.Supp. 470, 478–79 (D.D.C.1977).[17]

### State Law Claims

Counts 6, 7, 8 and 9 are all pendent state claims. Under *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), since the Court is dismissing the federal claims in the case, it must dismiss the pendent claims as well.

### CONCLUSION

For all of the foregoing reasons, summary judgment in favor of defendants is granted on plaintiffs' federal claims and plaintiffs' pendent state law claims are dismissed.

SO ORDERED.

---

**17.** The Court notes incidentally that to the extent that plaintiffs' atmosphere of coercion theory relies upon alleged coercive conduct occurring prior to September 20, 1978, it must fail. *See* 15 U.S.C. § 15b (establishing four-year statute of limitations). And alleged coercive acts applied to non-plaintiff dealers, cannot support plaintiffs' claims unless they had actual knowledge of and were directly affected by the same. *See Hewitt v. Joyce Beverages, Inc.*, 721 F.2d 625, 628 (7 Cir.1983).