Rosemary BELFIORE, d/b/a Nutmeg News, Murray Berman, d/b/a Berman News Service and Murray's News Service, Brookwood Services Corporation, Greenacres Com News Ltd., Grove News Service, Inc., Zigmunt Poplaski, d/b/a Z & J News Service, Richard Ritter, d/b/a Greenfield Hills News Service, and Eric Scott, d/b/a New Canaan/Scotty's News Service, Plaintiffs-Appellants,

v.

The NEW YORK TIMES COMPANY and MCI Corporation, Defendants-Appellees,

Harold Ball, Jr., d/b/a Ball News Service, Eric Scott, d/b/a New Canaan/Scotty's News Service, Rosemary Belfiore, d/b/a Nutmeg News, Murray Berman, d/b/a Berman News Service and Murray's News Service, Salvatore Belfiore, d/b/a Nutmeg News and James J. Hill, d/b/a Muke's News, Third-Party Defendants, Defendants on Counterclaim.

No. 1351, Docket 87–7280.

United States Court of Appeals, Second Circuit.

Argued June 17, 1987.

Decided Aug. 7, 1987.

Denis McInerney, New York City (George Freeman, The New York Times Co., New York City, Charles Platto, Patricia Farren, David S. Smith, Cahill Gordon & Reindel, New York City, of counsel), for defendant-appellee The New York Times Co.

John E. Lee, New Haven, Conn., Ronald J. Cohen, Tyler Cooper & Alcorn, New Haven, Conn., on brief, for defendant-appellee MCI Corp.

Peter G. Eikenberry, New York City (Paul R. Levenson, Marilyn B. Fagelson, New York City, of counsel), for plaintiffs-appellants.

Before OAKES, MESKILL and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment entered in the United States District Court for the District of Connecticut, Zampano, J., which granted the motion for summary judgment offered by defendants, The New York Times Co. (the Times), several newspaper wholesalers that distribute *The New York Times* and MCI Corporation (now named Callcenter Services, Inc. and hereinafter CSI), an independent telephone soliciting firm employed by the Times. *Belfiore v. New York Times Co.*, 654 F.Supp. 842 (D.Conn.1986). Plaintiffs are independent morning newspaper home delivery dealers. They allege that defendants have abused monopoly power, conspired to monopolize and attempted to monopolize under section two of the Sherman Act, 15 U.S.C. § 2 (1982), and fixed prices and conspired with others in restraint of trade under section one of the Sherman Act, 15 U.S.C. § 1 (1982). Plaintiffs' Sherman Act claims arise from the Times' decision to compete with them in the home delivery of *The New York Times*. Plaintiffs also appeal from the district court's denial of certain of their discovery requests and their motion for leave to amend the complaint. Finally, plaintiffs appeal from the district court's order denying their motion to disqualify for bias the special master, complaining that the alleged bias now requires vacatur and remand for new proceedings. For the reasons that follow, we reject plaintiffs' contentions and affirm the judgment below.

## BACKGROUND

The Times publishes *The New York Times*. The Times distributes *The New York Times* through newspaper wholesalers, who distribute it (and other newspapers such as *The New York Daily News* and *The New York Post*) to independent morning delivery dealers, such as plaintiffs, and to retail outlets. The Times holds no ownership interest in the wholesalers or the independent dealers.

Plaintiffs deliver morning newspapers in exclusive territories located in Fairfield County, Connecticut. A New York publishers' association established these territories several years ago. Pursuant to the territorial allocations, the plaintiffs deliver all of the association's members' papers, and other papers, to home subscribers. Plaintiffs allege that over seventy-five percent of their deliveries are of *The New York Times*.

Prior to September 1982, plaintiffs experienced no competition in their territories. Thereafter, however, the Times instituted its own home delivery system in Fairfield County (the T–Route system), allegedly in response to a precipitous decline in home subscriptions over the preceding four years. The T–Route system delivers *The New York Times* to home subscribers in competition with plaintiffs, who concede that they still are able to purchase and deliver *The New York Times* and the other newspapers they traditionally have carried to their customers. Through its T–Routes the Times has gained fifteen percent of the home delivery market in Fairfield County.

Plaintiffs filed this action in September 1982. The district court appointed a special master, Kenneth Wallace, to supervise discovery and pretrial proceedings. Wallace formerly had been associated with defendants' counsel, Cahill Gordon & Reindel, and briefly served in unrelated legal matters as local counsel for Cahill Gordon during his tenure as special master. This relationship

prompted plaintiffs to move to disqualify Wallace under 28 U.S.C. § 455 (1982), which motion the district court denied. Plaintiffs appeal from this ruling, as well as from the district court's denial of certain of their discovery requests and their motion for leave to amend the complaint.

## DISCUSSION

### A. *Merits*

In reviewing the grant of summary judgment, we recently explained

that while [it] is a valuable means for avoiding unnecessary trials, and recent Supreme Court as well as Second Circuit cases have tended to encourage its use in complex cases such as this one, ... it should not be regarded as a substitute for trial. Thus, while the Supreme Court has indicated that trial courts should draw only reasonable inferences in favor of the non-moving party viewing the evidence as a whole, ... and while some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible, it is evident that the question of what weight should be assigned to competing permissible inferences remains within the province of the factfinder at trial.

*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.1987) (citations omitted). Applying these principles, we review the district court's judgment as to each of plaintiffs' claims.

### 1. *Abuse of Monopoly*

Monopolization in violation of section two requires a showing of " 'two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 68 (2d Cir.1984) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)).

In the district court, plaintiffs alleged that the Times monopolizes the "general interest daily newspapers directed primarily to upscale readers" market. 654 F.Supp. at 846. As the district court noted, this market definition is implausible as a theoretical matter. Plaintiffs' narrow definition is an awkward attempt to conform their theory to the facts they allege; this market definition does not reflect any relevant market evidenced in the record. *See Grinnell Corp.*, 384 U.S. at 590–91, 86 S.Ct. at 1713–14 (Fortas, J., with Stewart, J., dissenting) (criticizing narrow market definitions tailored only to those activities in which defendants engage; relevant market includes alternative sources of and substitutes for defendants' product reflecting "commercial realities").

■ The district court, looking to a relevant market defined in terms of general circulation daily newspapers, determined that plaintiffs failed to counter the Times' evidence that it does not possess a monopoly in Fairfield County. The Times produced uncontradicted evidence that *The New York Daily News* and *The New York Post* have greater circulation than *The New York Times*. J.App. at 1950–51. The district court's holding that the Times does not possess monopoly power in this market is not error.

■ On appeal, however, plaintiffs proffer a new market definition. Plaintiffs for the first time theorize that the Times monopolizes the market for the sale of newspaper advertising throughout the New York metropolitan area and that any injury to independent home delivery dealers would further that monopoly. Plaintiffs' advertising monopoly allegation rests on the Times' ability to charge higher advertising rates than do the publishers of *The New York Daily News* and *The New York Post*. Plaintiffs' abuse of monopoly theory rests on the premise that the Times will force out the independent dealers through the T–Routes. Having destroyed the independents, the Times allegedly would thereby exclude newspapers that compete with it for advertising dollars from access to the home delivery market, thus strengthening

its advertising monopoly, which depends to a large degree on home delivery circulation.

Assuming *arguendo* that plaintiffs' theory should be heard for the first time on appeal, we reject it. Plaintiffs failed to offer any proof whatsoever that the Times' publishing competitors could not, in the absence of independent dealers, deliver their own newspapers directly to home subscribers. Plaintiffs have not countered the district court's suggestion, and the Times' contention, that the T–Routes themselves are available to deliver the Times' publishing competitors' papers. *See* 654 F.Supp. at 849. The record also suggests that several other publishers have instituted their own direct delivery networks, J.App. at 1956. *See Martindell v. News Group Publications, Inc.*, 621 F.Supp. 672, 674 (E.D.N.Y.1985) (discussing direct delivery of *The New York Post*).

As the district court noted, vertical integration even by a monopolist publisher "does not, without more, offend Section 2." 654 F.Supp. at 847 (citing cases); *see, e.g., Bowen v. New York News, Inc.*, 522 F.2d 1242 (2d Cir.1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir.) (in banc), *cert. denied*, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); *White v. Hearst Corp.*, 669 F.2d 14 (1st Cir.1982); *Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir.1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). Summary judgment was proper on the monopolization claim.

**2.** *Attempt to Monopolize*

Plaintiffs have not pursued this claim on appeal. We deem it abandoned. *See Cloutier v. Town of Epping*, 714 F.2d 1184, 1189 n. 2 (1st Cir.1983).

**3.** *Price Fixing*

 Plaintiffs allege that the Times engaged in vertical price fixing through coercion in violation of section one of the Sherman Act. "[A] supplier may not use coercion on its retail outlets to achieve resale price maintenance." *Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964); *see generally Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52–53 (2d Cir.1980). The testimony of several of the plaintiffs, however, indicated that they were not threatened or coerced. Moreover, the record, largely composed of plaintiffs' depositions, reveals that their prices varied widely and were substantially higher than the Times' delivery prices. This pricing evidence confirms that no coerced pricing occurred. *See Reborn Enterprises, Inc. v. Fine Child, Inc.*, 590 F.Supp. 1423, 1439 (S.D.N.Y.1984), *aff'd per curiam*, 754 F.2d 1072 (2d Cir.1985). Plaintiffs' real complaint is that competition from the Times is pressuring them to lower their prices. Such competition is precisely the conduct the antitrust laws were designed to foster, not suppress. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Summary judgment here was correct.

**4.** *Conspiracy to Restrain Trade*

Plaintiffs contend that CSI and the newspaper wholesalers conspired with the Times to unreasonably restrain trade in the sale of home delivered newspapers in violation of section one. This claim requires proof (1) that two or more of the defendants "entered into a 'contract, combination ... or conspiracy,' and (2) that the conspiracy was 'in restraint of trade or commerce among the several States.'" *International Distribution Centers v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir.1987) (quoting 15 U.S.C. § 1), *cert. denied*, —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). The district court rejected this claim on alternative grounds. The court held that, as a matter of law, CSI and the wholesalers did not have the capacity to conspire with the Times and, even if they did, there was insufficient evidence of the alleged conspiracies.

**(a)** *Capacity to Conspire*

Judge Zampano ruled that there was no possibility of "[c]oncerted action between two or more distinct economic entities" be-

cause CSI and the wholesalers were "agents [without] the legal capacity to conspire with the Times." 654 F.Supp. at 850 (footnote omitted). The court correctly noted that capacity to conspire is determined by the economic realities of the alleged coconspirators' relationship, and accurately recited the applicable rationale and underlying elements we articulated in *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031 n. 5 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). *See* 654 F.Supp. at 850 n. 11.

■ The district court's application of these principles, however, was incorrect. The court, in concluding that neither CSI nor the wholesalers had the capacity to conspire with the Times, reasoned: " '[I]f it is not an antitrust violation for a manufacturer to change his distribution system, then it can hardly be evidence of an illegal conspiracy that the manufacturer seeks merely to secure the personnel to man this new system.' " 654 F.Supp. at 850 (quoting *Fuchs*, 602 F.2d at 1031). Parties performing discrete steps in the distribution or manufacturing chain, however, frequently have been held liable for conspiring in violation of section one. *See, e.g., Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 765, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (supplier and its distributor conspired to maintain resale prices and terminate price cutters in violation of section one); *Bowen*, 522 F.2d at 1256 (newspaper publisher conspired with franchised dealers to cut off price cutters' supply in violation of section one). The salient question is not whether, by vertically integrating, the supplier could perform the alleged coconspirator's function; rather, the proper inquiry focuses on whether the alleged coconspirators are economically distinct entities.

The district court pointed to one characteristic of CSI's relationship with the Times of conceivable relevance under *Fuchs*. The court noted that "CSI works under contract to the Times to respond to incoming customer calls." 654 F.Supp. at 850. This relationship might suggest CSI's independence from the Times if it reflected CSI's function as being "other than securing an offer from a buyer for the [Times'] product," *Fuchs*, 602 F.2d at 1031 n. 5, but the district court did not address it in these terms or point to facts suggesting that this was or was not the case.

As to the wholesalers, the district court noted only that the wholesalers are compensated on a per paper basis and do not bear the risk of loss for unsold papers. This factor, while relevant, standing alone cannot support the district court's ruling made in the context of summary judgment. *See Bulkferts, Inc. v. Salatin, Inc.*, 574 F.Supp. 6, 8 (S.D.N.Y.1983) (denying defendants' motion for summary judgment on capacity to conspire issue because of complexity of requisite factual analysis). As the Seventh Circuit recently explained, "the terms of the agency agreement do not always resolve the issue whether the antitrust laws have been violated." *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1439 (7th Cir.1986); *see id.* at 1438 (noting "continuum bounded at one end by the manufacturer's full-time employees and at the other by vast, autonomous distribution enterprises").

■ As a result of our holding here that there was insufficient *evidence* of the alleged conspiracies, *see* Part (b), *infra*, we need not determine whether CSI or the wholesalers actually were capable of conspiring with the Times. We stress, however, that proper inquiry into capacity to conspire requires a thorough application of the *Fuchs* principles to the facts, including the number and nature of the agent's functions, *Morrison*, 797 F.2d at 1438, whether the agent acts in its own interests or in the supplier's, *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466, 469 (8th Cir. 1985), and whether the alleged coconspirators are in reality under the control of a single individual or entity. *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 455–58 (9th Cir.1979).

### (b) *Evidence of Conspiracy*

■ The Times employed CSI, a telephone marketing company, to handle incoming calls regarding the T–Routes. The

Times' decision to institute the T–Route system was not a violation of the antitrust laws. *See* Parts A.1 and 2, *supra.* The Times' hiring of CSI to help implement the T–Routes, therefore, does not of itself evince an "antitrust 'conspiracy.' " *Bowen,* 522 F.2d at 1254. The sole evidence of conspiratorial behavior consists in a few isolated and nonrecurring instances in which CSI falsely disparaged some independent dealers. There is no evidence, however, that the Times knew of or encouraged this behavior. *Cf. id.* at 1256 (evidence that newspaper publisher instructed alleged coconspirators "to tell customers in their areas that the independent route dealers were no longer in business" probative of section one conspiracy). Plaintiffs' evidence simply does not " 'tend[ ] to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Electric Indus. v. Zenith Radio Corp.,* 475 U.S. 574, ——, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (quoting *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)), and cannot give rise to a reasonable inference of conspiracy.

Turning to the alleged vertical conspiracy between the wholesalers and the Times, plaintiffs' evidence consisted of the allegation that the wholesalers discriminated against them in favor of T–Routes in the timing of deliveries. Plaintiffs failed to substantiate their claim. Some plaintiffs even admitted that any delays in delivery were temporary and in any event did not cause real harm. *See* J.App. at 2590–93, 2795. Plaintiffs' other evidence of a conspiracy consists of the additional fees for additional services that the wholesalers charge plaintiffs and other independent dealers. Without more, this evidence cannot give rise to a reasonable inference that the wholesalers did not act independently. There simply is no evidence of concerted behavior.

Plaintiffs similarly failed to show that the alleged conspiracy was anticompetitive in effect either in the home delivery market or the newspaper advertising market. The uncontroverted evidence establishes that the T–Routes *created* competition in the home delivery market; prior to the Times' entry, plaintiffs enjoyed complete monopolies in their respective exclusive territories. As to possible anticompetitive consequences at the publishing level, plaintiffs' claims rest solely on the speculation rejected at Part A.1, *supra.* There is no evidence of a restraint on the distribution of newspapers at any level.

Summary judgment was proper on the conspiracy to restrain trade claim.

### 5. *Conspiracy to Monopolize*

■ "The essence of [this] offense[ ] is an agreement entered into with the specific intent of achieving monopoly." *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 85 (2d Cir. 1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *see International Distribution Centers,* 812 F.2d at 795–96 & n. 8. The record is bereft of any evidence that the wholesalers harbored the proscribed intent to monopolize. The record is similarly barren with respect to CSI's intent. Even if the Times did possess the requisite intent to achieve a monopoly in any market, a proposition resoundingly rejected by the district court, 654 F.Supp. at 848, this claim would fail for lack of evidence that the intent was shared by agreement with another party.

We, therefore, affirm the district court's disposition of the defendants' motion for summary judgment.

### B. *Interlocutory Rulings*

■ Plaintiffs appeal from the district court's denial of certain discovery requests and of leave to amend the complaint. Each of these rulings is subject to reversal only for abuse of discretion. *Robertson v. National Basketball Association,* 622 F.2d 34, 35–36 (2d Cir.1980) (discovery rulings); *Evans v. Syracuse City School District,* 704 F.2d 44, 47 (2d Cir.1983) (leave to amend the complaint). The district court denied plaintiffs' request for the Times' cost, pricing and other practices in its relationships with dealers outside the Fairfield County area and for cost data relating to

the T–Routes. The denial was "with leave to broaden discovery at a later date," J. App. at 118, in the event plaintiffs made some showing of need or relevance. *See id.* at 118–20. Plaintiffs never did so. Plaintiffs likewise failed to comply with Fed.R.Civ.P. 56(f), which requires the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion to file an affidavit describing the nature of the requested discovery, its relevance to genuine issues of material fact, what efforts the affiant has made to obtain the discovery and why those efforts were unsuccessful. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985). The district court did not abuse its discretion in its discovery rulings.

Plaintiffs offered their amended complaint fourteen months after defendants moved for summary judgment. It asserted no newly discovered material facts and did not explain the delay. We find no abuse of discretion here.

### C. *Bias Claim*

■ Plaintiffs contend that the failure of the special master, Kenneth Wallace, and defendants' counsel, Cahill Gordon, to disclose fully their relationship required Wallace's disqualification from the district court proceedings and that the relationship now requires vacatur of the district court's judgment. Wallace spent fourteen years as a Cahill Gordon associate ending in 1960, twenty-three years before his appointment as special master. Cahill Gordon occasionally referred business to Wallace after he left the firm and employed Wallace as local counsel in a case in which his involvement terminated before he became special master, except for the drafting of a stipulation of discontinuance. Wallace also procured service of a subpoena in another case for Cahill Gordon approximately eight months after his appointment. Wallace has never worked on any matter regarding the parties in the instant case. J.App. at 1568.

On January 22, 1986, the district court conducted a hearing on Wallace's petition to be paid a portion of the $236,397 in fees generated during his service prior to 1986. At this hearing, plaintiffs complained that Wallace had failed to disclose adequately his relationship with Cahill Gordon. *See* J. App. at 1454–1532. The transcript of this proceeding reveals that only Wallace's employment as local counsel and his procurement of the subpoena may not have been timely disclosed.

In total, Wallace's relationship with Cahill Gordon did not rise to the level requiring disqualification or vacatur. *Compare Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460–61 (7th Cir.1985) (ordering recusal where employment service retained by presiding district judge contacted law firm, one of the counsel for the defendants in the underlying action, regarding possible employment of judge; test for disqualification is "whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case"); *Hall v. Small Business Admin.,* 695 F.2d 175, 176–77 (5th Cir.1983) (magistrate erred in refusing to disqualify himself where "magistrate's sole law clerk was initially a member of the plaintiff class in [the underlying] suit, had [prior to] her employment with the magistrate expressed herself as convinced of the correctness of [the plaintiff class'] contentions, and accepted employment with its counsel before judgment was rendered"), *with National Auto Brokers v. General Motors Corp.,* 572 F.2d 953, 958–59 (2d Cir.1978) (motion to disqualify properly denied where district judge formerly a member of law firm representing defendant but never worked on any matter involving defendant except for an opinion letter), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Singer v. Wadman,* 745 F.2d 606, 608 (10th Cir. 1984) (district judge's former partnership with defendant's lawyer does not require disqualification), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985). Moreover, Wallace's role as special master in the district court proceedings ceased long before the argument and submission of defendants' summary judgment motion, and his role was limited to controlling dis-

covery subject to review by Judge Zampano and assisting in the framing of issues. Judge Zampano's opinion did not rely on any factual findings or legal conclusions made by Wallace. Not surprisingly, plaintiffs wholly fail to offer an intelligible basis for their claim that the relationship tainted the district court's judgment.

Our rejection of plaintiffs' claim, however, does not end the matter. Plaintiffs' claim arises from Cahill Gordon's and Wallace's lax performance of their joint responsibility to investigate and make full and timely record disclosure of any possible basis for disqualification. *See generally Code Of Judicial Conduct For United States Judges*, 69 F.R.D. 273, 286 (1975) (Code of Judicial Conduct applicable to special masters). Cahill Gordon apparently perceives that informal conversation, rather than documented disclosure, suffices. J.App. at 1494. We emphasize that failure to make record disclosure creates a twofold dilemma; it hinders effective appellate review and invites potentially frivolous bias claims by disappointed litigants. We trust that counsel will make better record disclosure in the future.

The judgment of the district court is affirmed.