**TRANS SPORT, INC., Plaintiff,**

v.

**STARTER SPORTSWEAR, INC., Defendant.**

**No. 88–CV–1292.**

United States District Court, N.D. New York.

Sept. 3, 1991.

Coughlin & Gerhardt, Binghamton, N.Y. (Peter H. Bouman, Robert C. Murphy, Richard W. Mertens, of counsel), for plaintiff.

Harter, Secrest & Emery, Rochester, N.Y. (Kenneth A. Payment, Carol L. O'Keefe, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

McAVOY, District Judge.

### Background

Various professional sports organizations—Major League Baseball, the National Hockey League, the National Basketball Association and the National Football League, insofar as relevant here—possess the exclusive right to license the commercial use of their member teams' names, symbols, emblems, designs and colors on merchandise. The unauthorized use of these names, symbols, etc. subjects the user to money damages and injunctive relief.

Hundreds of manufacturers are licensed to produce merchandise of all sorts bearing the teams' trademarks, i.e., their names, symbols, etc.. *See* Vols. II and III to Defendant's Motion for Summary Judgment, Exhibits 14–22. Defendant Starter Sportswear, Inc., however, is, and has been for some time, the sole manufacturer of authentic official team jackets pursuant to licensing agreements between it and the above-mentioned professional sports organizations. As a result of these agreements, defendant has the exclusive right to manufacture and sell these authentic official team jackets on a nationwide basis. It is alleged that by virtue of these licensing agreements defendant has acquired a national monopoly in the manufacture and sale of the foregoing authentic official

team jackets (hereinafter referred to as Starter team jackets).

In January 1986, plaintiff's predecessor-in-interest, the Stickley Corporation, entered into the business of selling Starter team jackets on a retail basis. After approximately six months in the retail business, Stickley decided that conditions existed which indicated that entering into the business of distributing Starter team jackets to other retailers on a nationwide basis would be financially lucrative. It therefore began purchasing large volumes of Starter team jackets for distribution to these retailers; the business apparently proved to be quite successful.

Subsequently, in March 1987, Starter's national sales manager advised Stickley that Starter would have to re-evaluate its relationship with Stickley if Stickley did not limit its resale of Starter team jackets to: (a) sales through a consumer catalog; (b) sales from Stickley's retail store; and (c) premiums on company-run stores. Thereafter, Starter refused to ship Stickley's Fall 1987 order of jackets unless Stickley agreed not to transship Starter products. Stickley refused claiming that such an agreement, in its view, violated the law. Starter then inserted the following conditions in its new order forms:

> No transshipments: Starter has a policy of selling only directly to selected retail outlets for resale by them at specified locations. Proposed sale at any new retail outlet requires advance written approval from Starter's Home Office. Resale or transshipments of our merchandise to an unauthorized location or to another business contravenes that policy and the items and conditions of sale and may result in non-shipment or termination of the retailer's business relationship with Starter.

Complaint at 5, ¶ 21. Starter has refused to deal with Stickley and plaintiff Trans Sport Inc. by not honoring orders from February 16, 1987 to the present day.

Annoyed at these turn of events, plaintiff, claiming the loss of substantial profits, commenced the present action, seeking treble damages and permanent injunctive relief, alleging that "Starter has intentionally used the monopoly power it has at the manufacturing level to eliminate Stickley as a competitor at the distributor-wholesaler level in violation of Section 2 of the Sherman Act." Additionally, plaintiff alleges (a) that "Starter's actions are intentionally taken to maintain artificially high prices at the consumer level in that they restrict supply, require retailers to place minimum orders, minimum reorders and to carry items of Starter merchandise which they cannot readily sell," (b) that Starter has knowingly maintained "monopoly power at the distributor-wholesaler level by anticompetitive conduct directed at [plaintiff]," and (c) that because of Stickley's refusal to deal plaintiff "has been unable ... to obtain and supply the goods necessary to service the retail market for NHL, NBA, MLB, and NFL licensed team jackets." Complaint at 6, ¶¶ 25–27.

Defendant moved to dismiss the complaint pursuant to Rule 12(b)(6) arguing (a) that the complaint fails to define and plead facts delineating the relevant product or geographic market, (b) that the complaint fails to allege anti-competitive conduct, (c) that plaintiff lacks standing to claim damages or injunctive relief in its own right, and (d) that plaintiff has failed to allege antitrust injury.

Upon review of the complaint in light of pertinent case law, and after hearing oral argument and considering defendant's reply memorandum, this court in March 1989 denied defendant's motion. In short, the court noted that, under its understanding of the law, plaintiff's allegations (essentially that defendant as a monopolist manufacturer and distributor has impermissibly refused to deal with it so as to allow it to compete with defendant at the distribution level) stated a cognizable claim under section 2 of the Sherman Act, which plaintiff has standing to pursue. Memorandum–Decision and Order (filed March 21, 1989). The court determined that plaintiff had adequately pleaded the relevant product market, *see id.* at 5–7, anticompetitive conduct, *id.* at 8–9, standing to sue, *id.* at 10–11, and anti-trust injury, *id.* at 11–12.

Some two years later, after the completion of discovery defendant has moved for summary judgment dismissing the action arguing first that defendant does not have monopoly power in the relevant product market which it defines to be broader than authentic official satin NFL, NHL, NBA and MLB team jackets. In this regard, defendant contends that "the facts demonstrate [that] plaintiff's bald allegations concerning the unavailability of comparable, substitute products are false, and the case-law clearly indicates that the relevant product market encompasses many products in addition to Starter's satin team jackets." Defendant's Memorandum of Law at 42. Second, defendant argues essentially that, even if it possesses monopoly power, and here it concedes that it possesses a natural monopoly over the distribution of the jackets it manufactures, the maintenance of its distribution system, whereby it retains the power to choose its retailers so as to be able to market its products as it sees fit, has not yielded unreasonable anti-competitive effects.

The court's great discomfort with this case, and particularly with plaintiff's position, in effect that a retailer should be able to tell the manufacturer/distributor how to run its business so that the retailer can enjoy greater profits, prompted the court to require additional briefing through an order which read as follows:

In order to prevail on a monopolization claim under section 2 of the Sherman Act, a plaintiff must prove that the defendant has wilfully acquired or maintained monopoly power in the relevant market. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19 [86 L.Ed.2d 467] (1985); *Volvo North America Corporation v. Men's International Professional Tennis Council*, 857 F.2d 55, 73 (2d Cir.1988); *Belfiore v. New York Times Co.*, 826 F.2d 177, 180 (2d Cir.1987), *cert. denied*, [484 U.S. 1067] 108 S.Ct. 1030 [98 L.Ed.2d 994] (1988). Assuming for argument's sake that defendant possesses monopoly power in the relevant product market as defined by plaintiff, given that licensing agreements secured by defendant from various professional sports organizations are the source of defendant's exclusive right to manufacture authentic official team jackets, can defendant be deemed to have acquired or maintained that monopoly power wilfully rather through growth or development as a consequence of business acumen?, and if so, how? Moving on, assuming for argument's sake that defendant possesses monopoly power at the product distribution level, does, or under what circumstances would, such a monopolist have a duty to supply its product to a retailer so that the retailer may compete as a distributor. Viewed slightly differently, does, or under what circumstances would, the (assumed) monopolist's refusal to supply the retailer with its product so that the retailer does not transship to retailers not of the manufacturer's choosing, constitute wilful maintenance of monopoly power? In other words, as to the last question, what does wilful maintenance mean and what must be proved?

The briefing requested has been submitted. Suffice it to say that at this juncture the court has substantial doubts about the correctness of its decision denying defendant's motion to dismiss under Rule 12(b)(6). Nevertheless, the case has proceeded forward through discovery, and, notwithstanding the extensive briefing undertaken by the parties, the court is of the view that the case lends itself to straightforward resolution.

The issue posed by this case, and by defendant's motion, is whether defendant, a vertically-integrated firm, should be held liable under section 2 of the Sherman Act for refusing to deal with one of its retailers unless that retailer stops supplying retailers not of defendant's choosing and not under defendant's control with defendant's product. In the court's view, bolstered by the absence of any reported decisions presenting this issue, and by the results in cases somewhat similar to the present one, liability cannot be imposed and defendant's motion for summary judgment must be granted. Even if defendant possesses mo-

nopoly power in the product market as defined by plaintiff, defendant did not use this power to gain a monopoly or a competitive advantage at the distribution level, and, more to the point, accepting that defendant possesses monopoly power at the distribution level, it has not willfully maintained its natural monopoly at the distribution level—plaintiff cannot prove that defendant engaged in unreasonable anticompetitive conduct, that is, that defendant's conduct has yielded unreasonable anticompetitive effects. Simply stated, preventing plaintiff from continuing in the wholesale distribution market does not constitute the unreasonable exercise of defendant's distribution monopoly power under federal antitrust law.

*Discussion*

■■■■ Briefly stated, in order to prevail on a typical monopolization claim under section 2 of the Sherman Act, a plaintiff must prove that the defendant (a) possesses monopoly power in the relevant market and (b) has acquired or maintained that power willfully rather than through growth or development as a consequence of, for example, business acumen. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985); *United States v. Grinnell*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Volvo North America Corporation v. Men's International Professional Tennis Council*, 857 F.2d 55, 73 (2d Cir.1988); *Belfiore v. New York Times Co.*, 826 F.2d 177, 180 (2d Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988); *Paschall v. Kansas City Star Co.*, 727 F.2d 692, 695–696 (8th Cir.) (in banc), *cert. denied*, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); *Theatre Party Associates, Inc. v. Schubert Organization, Inc.*, 695 F.Supp. 150, 153 (S.D.N.Y.1988). The instant case might appear to present a variant monopolization claim—i.e., "leveraging," the essence of which is the use of monopoly power at one stage of production or in one market to gain a monopoly or a competitive advantage at another stage of production or in another, related market. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275–276 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334, 339 (5th Cir.1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971); *Belfiore v. New York Times Co.*, 654 F.Supp. 842, 847 (D.Conn.1986) (citing R. Posner and F. Easterbrook, *Antitrust*, 869–76 (1981), *aff'd*, 826 F.2d 177 (2d Cir. 1987)). The problem here, however, is that the court is not presented with a situation in which an asserted monopolist is seeking to use its monopoly power to expand into (or even to place restraints on) an already existing distribution system and thereby unreasonably thwart competition. *See, e.g., Belfiore*, 826 F.2d at 181; *Paschall*, 727 F.2d 692; *Byars v. Bluff City News Co.*, 609 F.2d 843, 853–863 (6th Cir.1979); *Berkey Photo*, 603 F.2d at 275–276. What the court is presented with is a situation in which a manufacturer (who has secured the exclusive right to manufacture authentic official team jackets through various licensing agreements with the professional sports organizations, which licensing agreements are of limited duration and which may not be renewed if the sports organizations are not satisfied), desires to maintain its natural monopoly over the distribution of its own product by refusing to supply one of its retailers unless that retailer agrees not to transship to other retailers with whom the manufacturer has decided not to conduct business, i.e., an unauthorized retailer and one over whom the manufacturer has no control. In other words, the situation presented is not an attempt to vertically integrate forward, i.e., into an existing distribution system, but rather one in which the manufacturer desires to maintain its existing natural distribution monopoly. Plaintiff has not cited one case that is similar to the situation presented here. (*Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir.1983) is not to the contrary; that case involved a challenge, under section 1 of the Sherman Act, to non-price vertical restraints imposed by the manufacturer on existing distributors.)

In support of its motion for summary judgment, defendant argues, as to the issue of its possession of monopoly power, that it simply does not possess monopoly power in the relevant product market, which it contends is broader than that defined by plaintiff: to wit, official and authentic satin team jackets. In other words, defendant disputes, as a matter of law and as a matter of fact, plaintiff's contention that "the relevant product market is limited to Starter's satin team jackets, because they are the only 'official and authentic NFL, NHL, NBA and MLB jackets in existence.'" Defendant contends that as a matter of law the relevant product market cannot be so narrowly defined and that as a matter of fact plaintiff cannot prove the alleged product market. Defendant's bottom line is that there is a "universe of officially licensed jackets and outerwear available [and that] plaintiff's limited market definition cannot stand. Starter's authentic satin jackets must compete in the marketplace, and they are even now losing ground."

Also defendant stresses that its "monopoly" at the product distribution level is a consequence of the manner in which has chosen to do business—it manufactures its product and it distributes that product to retailers with whom it has agreed to do business. Its "direct dealing" distribution system consists of a network of sales representatives, some of whom are Starter employees (assigned particular retail customers) and some of whom are independent contractors (assigned specific territories).

Be that as it may, even if defendant possesses monopoly power in the relevant product market as defined by plaintiff and at the product distribution level, summary judgment in defendant's favor would still be warranted, for, as a matter of law, defendant has certainly not acquired that distribution monopoly willfully (or unlawfully), an issue that needs no further discussion; nor has it willfully maintained that monopoly.

 At the very least, willful maintenance of monopoly power requires the plaintiff to prove that the monopolist has acted in an unreasonably exclusionary manner, that is, that the monopolist's challenged practice has yielded unreasonable anticompetitive effects. *See Aspen Skiing Co.,* 472 U.S. at 602–605, 105 S.Ct. at 2857–2859; *United States Football League v. National Football League,* 842 F.2d 1335, 1358–1359 (2d Cir.1988); *Oahu Gas Service, Inc. v. Pacific Resources Inc.,* 838 F.2d 360, 370 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); *Paschall,* 727 F.2d at 696–698, 701–702; *Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 791 (5th Cir.1982); *Byars v. Bluff City News Co.,* 609 F.2d at 853, 860–863. In the present case, plaintiff challenges the refusal of the already vertically-integrated defendant manufacturer to continue to supply it with authentic official team jackets until such time as plaintiff agreed not to act as a distributor supplying unauthorized retailers with defendant's product as anticompetitive conduct, that is, conduct yielding unreasonable anticompetitive effects. Defendant's presentation in support of its motion for summary judgment readily reveals that there is no substance to plaintiff's challenge as a matter of law and as a matter of fact.

First, the court notes that there exists no special duty on the part of defendant to ensure that its retailer is able to compete with it at the distribution level. *See, e.g., United States Football League v. National Football League,* 842 F.2d at 1360–1361; *Olympia Equipment Leasing Company v. Western Telegraph Company,* 797 F.2d 370, 376 (7th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *see also Aspen Skiing Co.,* 472 U.S. at 600, 105 S.Ct. at 2856. Plaintiff's perfunctory citation to and reliance upon *Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986), wherein the Court stated that, in the context of determining relevant geographic market, "[w]e know of no rule that states that the parties must be in head-to-head competition *in* the relevant market (as opposed to head-to-head competition *for* the relevant market) before the antitrust laws will apply," *id.* at 531, is sorely misplaced. Second, even in the absence of such a duty, defendant's legitimate busi-

ness decision to limit distribution of its product to certain retail outlets (and thereby refuse to supply plaintiff with authentic official jackets unless plaintiff agreed not to transship to unauthorized retailers without defendant's permission) is not conduct which has yielded unreasonable anticompetitive effects.

Defendant has, since its inception, distributed its products and had, in fact, been the sole distributor. *See Disenos Artisticos e Industriales, S.A. v. Work,* 714 F.Supp. 46, 48 (E.D.N.Y.1989) (recognizing that every manufacturer has a natural monopoly in the sale and distribution of its own product). As has been noted previously, no cases have been found in which a manufacturer was held liable for refusing to let go of its natural monopoly over distribution, i.e., for refusing to open up an integrated wholesale distribution system. *Cf. Olympia Equipment Leasing,* 797 F.2d at 376–380 (noting that, as a general matter, even a monopolist who has extended a helping hand to a potential competitor does not incur antitrust liability upon withdrawing that helping hand in the absence of an objectively anticompetitive act such as denial of access to essential facilities); *Parsons v. Ford Motor Co.,* 669 F.2d 308, 312 (5th Cir.) (observing that the district court had dismissed claim of an unauthorized Ford dealer under section 2 of the Sherman Act on the ground that every manufacturer has a natural monopoly in the sale of its own products and that such natural monopolies do not contravene antitrust laws), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *Disenos Artisticos,* 714 F.Supp. 46 (the court observing that a manufacturer with such a natural monopoly has every right to designate a particular firm as its sole distributor and, through that firm, to prohibit retailers from becoming unauthorized wholesalers or distributors). To impose liability in a case such as the present one would have the effect of punishing the manufacturer for having undertaken legitimate business decisions and would result in requiring manufacturers such as defendant to forego their natural monopoly over distribution and over control of how their product is marketed, in short, over a significant portion of their business just so another firm can realize additional profits for itself. *See Sports Center,* 673 F.2d at 791 ("Unless decidedly unreasonable, vertical restraints upon product distribution are permissible and even desirable.") At best, it may very well be that defendant's refusal to deal with plaintiff constitutes injury to a would-be competitor and not to competition generally, thereby taking the parties' dispute outside of the realm of the restrictions of federal antitrust law for it has been observed that the goal of antitrust law is to safeguard competition and not to protect specific competitors. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Oahu Gas Service, Inc. v. Pacific Resources Inc.,* 838 F.2d at 370. In any event, as noted, the refusal to permit one of its retailers to remain in the distribution business has not given rise to unreasonable anticompetitive effects.

Before proceeding any further, the court feels compelled to comment that the object of the parties' dispute is an item of apparel—sports team jackets, which comprise but a small portion of outerwear available for purchase to the public—and not, for example, telecommunications or a source of vital energy; moreover, even if plaintiff is not permitted to be a distributor of defendant's product, plaintiff can still continue in the lucrative retailing business. Moving on, defendant has demonstrated that its direct dealing distribution system, i.e., the system whereby it retains control over its natural monopoly over distribution, has enabled it to realize a number of objectives. First, defendant is able to select quality retail outlets consistent with the image of its products that defendant wants to project. Such retailers are selected, in part, because they are willing to make the necessary investments in advertising, in-store displays and promotions. By controlling the retail outlets, defendant is able to keep a more watchful eye on counterfeiting. The absence of a distribution network, or even of another distributor, translates into lower handling costs which enables the selected retailers to pay less for

defendants' product and therefore charge their customers less—in other words, it is hoped that retail competition is fostered. These objectives, among others noted by defendant, are facially valid to uphold defendant's decision to retain control over its natural distribution monopoly. Brief comment about some of them will suffice to uphold the court's ruling in defendant's favor.

Plaintiff has conceded that it must charge the retailers with whom it did business more for defendant's jackets than defendant charged its retailers. Plaintiff paid the same wholesale price, of course, and of necessity had to mark up the price for resale to its retailers. (Plaintiff added $7 per jacket and a second delivery charge. Defendant's July 29, 1991 Memorandum at 9 n. 3 (citing Plaintiff's June 14, 1991 Memorandum in Opposition to Summary Judgment at 82).) Although this practice was certainly lucrative for plaintiff, the court fails to understand the meaningfulness of the "competition" offered by plaintiff at the distribution level. Certainly, retail price competition would not be furthered by higher prices, and, contrary to plaintiff's assertions otherwise, plaintiff's presence as a competing distributor would not increase the supply of authentic official team jackets—defendant, as the manufacturer, controlled the production of those jackets as it saw fit. Plaintiff's contention that defendant's refusal to supply plaintiff with jackets for wholesaling stemmed from a desire to restrict supply so as to maintain high prices makes no economic sense and certainly runs counter to the fact that plaintiff's presence as a distributor resulted in higher costs to the retailers with whom it conducted business. To be sure, plaintiff made defendant's product available to retailers who would not have otherwise have gotten the jackets. But plaintiff's presence as a distributor did not, and indeed could not, drive wholesale prices down.

Plaintiff admits that defendant preferred to deal with the "Macy's of the licensed apparel industry, not the K–Marts of the world," Plaintiff's June 14, 1991 Memorandum at 41 (also noting that the list of defendant's 16 largest customers is, with the exception of Sears and J.C. Penney, composed almost entirely of sports specialty stores), as if this course of conduct were somehow wrongful, and has recognized that "*the place* where the jackets are sold was of apparent importance to Starter," *id.* at 43 (emphasis supplied), as if a manufacturer, and particularly a manufacturer who has secured an exclusive right to manufacture goods under certain terms and conditions, should not be concerned with such matters. It is eminently reasonable for a manufacturer to desire to ensure that its products are marketed in an appropriate manner by retailers who project a quality image with which the manufacturer wants to be associated and by a retailer who is willing and has the ability, for example, to advertise and display the product properly. Also, it goes without saying that defendant has a justifiable interest in preventing the manufacture of counterfeit jackets. Direct dealing enables defendant to maintain more control over the problem of counterfeiting—knowing who its authorized retailers are allows defendant to more easily track down goods sold at unauthorized outlets. Direct dealing also enables defendant to control the manufacture of its product and to better allocate its manufacturing resources: predictions must be made regarding which teams will be popular and therefore which jackets will be in demand; the retailers aid in this process and direct dealing facilitates the decision-making process.

It is in defendant's interest, as the holder of an exclusive manufacturing license of limited duration, to maintain an effective distribution system. That defendant has been granted these licenses since 1976 and has been quite successful supports the legitimacy of its direct dealing distribution system.

Generally speaking, vertical integration by a monopolist into distribution has been condemned where such conduct facilitates price discrimination, increases barriers to entry at the manufacturing level or aids in the evasion of the regulation of monopoly profits. *See, e.g., Paschall,* 727 F.2d at 702; *Byars v. Bluff City News Co.,* 609 F.2d at 861. Significantly, none of those

anticompetitive effects is present here: defendant charges all of its retailers the same price; the professional sports leagues themselves decide who will be granted the right to manufacture apparel and other products bearing the various sports teams' names, symbols, emblems, designs and colors. The instant case, simply put, presents the question whether, consistent with section 2 of the Sherman Act, a manufacturer can maintain and enforce its natural monopoly over the distribution of its products. In the court's view, it can. At the very least, the defendant's refusal to deal with plaintiff unless plaintiff agreed to stop transshipping does not constitute unreasonable anticompetitive conduct, that is, defendant's refusal to supply plaintiff with authentic official team jackets has not yielded any unreasonable anticompetitive effects. The court will not countenance the disruption of this manufacturer's effective and successful distribution system just so another firm can realize additional profits for itself.

## Conclusion

For the reasons stated above, the court grants defendant's motion for summary judgment dismissing the complaint.