Adams v. Stanley, et al.          CV-02-480-B    12/18/02   P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Marc Richard Adams

   v.                                                 Civil No. 02-480-B
                                                      Opinion No. 2002 DNH 216
Phil Stanley, et al.


**REPORT AND RECOMMENDATION**

The plaintiff, Marc Richard Adams, is an inmate at the New
Hampshire Department of Corrections ("NHDOC"), Northern New
Hampshire Correctional Facility ("NCF"). He alleges in his
complaint that the defendants have denied him his right to the
free exercise of his religion guaranteed by the First and
Fourteenth Amendments to the United States Constitution.[1]

Before the Court for consideration is Adams' motion for
interim injunctive relief enjoining NCF from depriving him of the
ability to hold Taoist religious celebrations, initiatory rites,
and festivals. Additionally, Adams seeks an order requiring NCF
to permit him to obtain certain religious articles, a religious

---

[1]Named as defendants in this action are the following
officers and employees NHDOC and NCF: Phillip Stanley,
Commissioner of the NHDOC; John Vinson, Esq., Counsel to the
Commissioner; Bruce Cattell, NCF Warden, Susan Young, NCF
Administrator of Programs, Ross Cunningham, NCF Captain; Daniel
Smith, NHDOC Director of Chaplaincy ("Chaplain Smith"); and Jane
and John Doe, Correctional Officers.

diet, and an exemption from the prison shaving requirement. Adams also seeks an order requiring NCF to allow him to practice Tai Chi Chuan ("Tai Chi").

After considering the testimony and other evidence presented at the hearing, and the relevant authorities, I find that the evidence does not support Adams' contention that NCF is currently violating his constitutional rights. Accordingly, I recommend that Adams' motion for interim injunctive relief be denied.

STANDARD OF REVIEW

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc., 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal., 840 F.2d 701, 704 (9th Cir. 1988); Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)). Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused by the defendant. CMM Cable Rep., 48 F.3d at 620.

2

A district court may grant a plaintiff's request for a preliminary injunction if the plaintiff satisfies a four-part test: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff will suffer irreparable harm if the injunction is not granted; (3) the injury to the plaintiff outweighs any harm which granting the injunction would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction.  See Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000); Public Serv. Co. of N.H. v. Patch, 167 F.3d 15, 25 (1st Cir. 1998).  A party seeking injunctive relief must independently satisfy each of the four factors.  Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981); Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness of Com. of Mass., 649 F.2d 71, 74 (1st Cir. 1981). In the First Circuit, the key issue in determining whether injunctive relief should be granted is whether the plaintiff can demonstrate a likelihood of success on the merits.  See Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998); Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).  With this standard in mind, the relevant facts are discussed below.

<u>BACKGROUND</u>

A thumbnail sketch of Taoism is helpful to understand Adams' claims. The word <u>Tao</u> may be translated into English as path, roadway or the way and "refers to a power which envelopes, surrounds and flows through all things, living and non-living."[2] Since early times the word Tao has taken on a spiritual and transcendent meaning for the same reasons that people refer to the Way of Christ or the Way of Buddha. <u>See</u> Introduction to <u>The Illustrated Tao Te Ching</u> at 15-16 (Man-Ho Kwok et al., trans., Element Books Limited 1993). "It is the natural use of the image of a path or roadway which leads us to something beyond ourselves." <u>Id.</u> Although commonly thought of as merely a philosophy, Taoism has been practiced as a religion for at least several centuries.

> The study of Tao originated in China: its history spans thousands of years. Its methods, doctrines, and practices have evolved into a sprawling and complicated system that cannot be grasped even with a lifetime of study. Some individuals try. Initiates into religious Taoism, having both the calling and opportunity, follow an arduous and devout life.

Deng Ming-Dao, <u>Everyday Tao: Living with Balance and Harmony</u> at viii (HarperSanFrancisco 1996).

---

[2]<u>See</u> "History of Taoism," posted by ReligiousTolerance.org and available at http:// <u>www.religioustolerance.org/taoism.htm.</u>

4

Adams claims that NCF is depriving him of a meaningful ability to engage in Taoist religious practices. He seeks an order requiring NCF to allow him to obtain certain religious articles for his personal use[3] and for temple practice.[4]

In addition, Adams seeks an order permitting him to practice Tai Chi, which he refers to as "moving meditation." Similar to Taoism, Tai Chi is practiced for religious and secular reasons.

---

[3]Adams seeks to obtain the following items for personal use: a meditation/prayer mat; a meditation/prayer cushion; a gourd; a bamboo flute; amulets; talismans made of natural materials; a robe; a wand; miniature statuettes for a shrine/alter; a singing bowl; herbs and herbal supplements; herbs to make teas; natural prayer oils for purification; an alter cloth; bowls constructed of natural materials; a box for the shrine; a drinking chalice; a scrying mirror; divination tools; uncensored religious literature; sacred journals; pens and markers for use with the sacred journals; stones and crystals; feathers; a headpiece; bags and wrapping for crystals and stones; Tai Ji balls; sandals; malas; non-animal product hygiene items; cords and sashes; Tai Ji literature and materials necessary for its practice; and Mandala posters for meditation. Plaintiff's Proposed Order at 1-3.

[4]Adams seeks to obtain the following items for temple practice: inks; feathers; stones/crystals; paper and natural parchment; pens and markers; divination tools; a scrying mirror; staffs; flags and banners; a drinking chalice; bowls; wooden boxes; cloth; altar/temple cloth; candles; candle holders; incense; incense holders; purification/prayer oils; herbs; singing bowls; gongs; Mandala posters; statutettes; prayer mats and cushions; an alter/shrine; a wand; ceremonial garb; amulets; talismans; gourds; flutes; chimes; clappers; fur; drums; buffalo horn; cauldron; lamps; sandals; videos and digital video disks; audio tapes and compact disks; office supplies; computer access; journals, tomes; head piece; cords and sashes; literature; and a storage space. Plaintiff's Proposed Order at pp. 4-6.

According to the International Taoist Tai Chi Society, "[t]he health-enhancing qualities of Tai Chi Chuan are founded in the lore of religious Taoism. Over a period spanning almost two millennia, various sects of Taoism have developed and perfected health exercises as part of their religious cultivation."[5] Eventually, Tai Chi began to be practiced by people outside of the monastic community and became widespread as a martial art.[6] It has, however, "maintained a tenuous link to the more spiritual or religious facets found in Taoist training."[7]

The defendants deny that they are depriving Adams of his constitutional rights. Defendants make the following contentions in response to Adams' claims: Adams has refused to comply with the prison's legitimate efforts to substantiate his claims that the certain religious items are essential to the practice of his religion; Adams has not completed inmate request forms specifying the religious ceremonies, festivals, and initiatory rites that he seeks to perform; NCF places reasonable limits on the practice of

---

[5] See "A Taoist Lineage," available on the Internet at http://www.taoist.org/About_Us/Taoist_Lineage/taoist_lineage.htm.

[6] Id.

[7] Id. Master Alfred Huang provides a similar historical account of the evolution of Tai Chi in the book Complete Tai-Chi at 45 (Charles E. Tuttle Publishing Co., Inc.) (1993).

Tai Chi in that inmates are prohibited from practicing martial arts moves for security reasons; and NCF is providing Adams a religious diet.

DISCUSSION

I.   Likelihood of Success on the Merits

   A.   Section 1983 Claims

Section 1983 creates a cause of action against those who, acting under color of state law, deprive individuals of "any rights, privileges or immunities secured by the Constitution and laws" of the United States.  See 42 U.S.C. § 1983; Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986); Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997).  In order to be held liable for a violation under § 1983, a defendant's conduct must have been a cause in fact of the alleged deprivation.  See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 692 (1978); Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997).

The premise of Adams' § 1983 claim is that the defendants, acting under color of state law, have wrongfully hindered the free exercise of his religion and denied him equal protection of the laws in violation of his rights under the First and

7

Fourteenth Amendments to the United States Constitution.  It is undisputed that the defendants' actions were taken under the color of state law, so I do not address that element further.

B. Free Exercise of Religion in Prison

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948).  However, a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  Pell v. Procunier, 417 U.S. 817, 822 (1974); see also, Bell v. Wolfish, 441 U.S. 520, 545 (1979) ("prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.").  The retained rights include the right to the free exercise of religion.  Cruz v. Beto, 405 U.S. 319, 322 (1972). Prisons must provide all inmates reasonable opportunities to exercise their religious freedom.  Id. at 322, n.2.  When a prisoner raises Free Exercise Clause claims, the prisoner must "establish that a challenged policy restricts the inmate's free exercise of a sincerely held religious brief."  See, e.g., Brown-

8

El v. Harris, 26 F.3d 68, 69 (8th Cir. 1994); Barnett v. Comm'r, N.H. Dept. of Corr., No. Civ. 98-305-JD, 2000 WL 1499490 (D.N.H. Apr. 26, 2000).

The Supreme Court has held that a prisoner's sincerely held religious beliefs must yield if contrary to prison regulations that are "reasonably related to legitimate penological interests." Turner v. Safely, 482 U.S. 78, 89 (1987); see also, O'Lone v. Shabazz, 482 U.S. 342, 351-352 (1987) (finding that the Constitution does not require the prison to sacrifice legitimate penological objectives to satisfy an inmate's desire to exercise his religion so long as an inmate is not deprived of all forms of religious exercise).[8] A prison regulation must have a logical connection to the legitimate governmental interests invoked to justify it. Turner, 482 U.S. at 89-90. That connection may not be "so remote as to render the policy arbitrary or irrational." Id.

---

[8]In City of Boerne v. Flores, 521 U.S. 507, 536 (1997), the Supreme Court held that the Religious Freedom Restoration Act of 1993 ("RFRA"), codified at 42 U.S.C. § 2000bb et seq., is unconstitutional as applied to the states. Therefore, the standards enumerated in the RFRA are inapplicable to Adams' claims against NHDOC and NCF. See Kikumura v. Hurley, 242 F.3d 950, 958 (10th Cir. 2001) (recognizing that the RFRA is invalid as applied to the states, but holding that the plaintiff, a federal prisoner, could pursue his RFRA claim against the federal defendants).

C.   NCF's Recognition of Religious Taoism

Adams alleges that the defendants have refused to recognize religious Taoism, and have denied him a meaningful opportunity to freely practice the religion.  At the preliminary injunction hearing, Chaplain Smith testified that NHDOC recognizes Taoism as a religion, and recognizes that Adams has a sincerely held belief in that religion.  Thus, for the purposes of Adams' motion for injunctive relief, the relevant issue is whether NCF is providing Adams reasonable opportunities to practice his religion.

Adams makes two primary arguments in support of his claims. First, he argues that NCF is discriminating against the Taoists by requesting that a representative of their group complete an eleven-point religious questionnaire, which is not required of other groups.  See Def. Ex. 11.  Second, he argues that he is being denied the same forms of religious items that inmates of other faiths are allowed to obtain.  See Pl. Ex. DD.  Adams contends NCF's actions evince a specific intent to discriminate against the members of the Taoist group.  As discussed below, I find that the evidence adduced at the preliminary injunction hearing shows that NCF is making reasonable efforts to afford Adams adequate opportunities to practice his religion.

10

1.  Religious Practices

Chaplain Smith testified that NHDOC places limits on inmates' exercise of religion in prison. One of those limits is that an inmate must be able to substantiate a claim that a particular religious practice or article is essential to his religion through a verifiable outside source. See NHDOC Policy and Procedure Directives ("PPD") 7.17, V(J)(1) ("The Chaplain shall schedule celebration of the sacramental rituals necessary to meet minimal requirements of a given religious faith.").

The evidence adduced at the hearing showed that on July 5, 2001, Chaplain Smith requested that NCF Inmate Travis Richardson answer the following questions on behalf of the Taoist group:

1.  What is the official name of the faith group?

2.  Who is the head of the faith group in the United States?

3.  What is the address and telephone number of the faith group? [H]eadquarters in the United States?

4.  What are the basic teachings of the faith group? Please provide titles or attach particular reference material which would be useful for researching this group.

5.  Does the faith group have ministers or teachers?

6.  Are ministers available to visit incarcerated members of the faith group?

11

7. Are there religious holidays to be observed by members? If so, when are the holidays and what religious practices are necessary for the observance?

8. Are there any necessary religious items and what is the religious significance of each?

9. Are there time and place requirements for the group?

10. Are you aware of related faith groups or other groups with similar practices?

11. Is the religion open to all inmates?

Def. Ex. 11. Chaplain Smith testified that he derived the eleven questions from a Federal Bureau of Prisons questionnaire regarding new or unfamiliar religious groups.

Adams makes several complaints specific to Chaplain Smith's 11-point questionnaire. He argues that his equal protection rights are being violated because he is not aware of any other group that has been asked to complete the questionnaire, and the questionnaire is not referenced in the NHDOC PPDs. Adams contends that completion of the questionnaire would violate the very nature of Taoism since the practice of Tao is specific to the individual. Adams also contends that he is opposed to Chaplain Smith's attempts to define his religious practices because those definitions would be used by NHDOC as a basis for

placing limits on other Taoists.

It is not appropriate for the court to attempt to identify the essential practices of an unfamiliar religion where the plaintiff has not done so himself. See Africa v. Com. of Pa., 662 F.2d 1025, 1030 (3d Cir. 1981) ("Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy."); see also, Natal v. Christian and Missionary Alliance, 878 F.2d 1575, 1576 (1st Cir. 1989) (finding that civil courts cannot adjudicate disputes turning on religious doctrine and practice). Unlike Christianity, Judaism, or Islam, religious Taoism has relatively few adherents in the United States.[9] While the Court might recognize that Easter, Passover, or Ramadan, are observances that are considered "essential" to their respective religions, the Court is unfamiliar with any such practices for religious Taoism. The evidence presented at the injunction hearing shows that Adams has not complied with the prison's reasonable attempts to substantiate his claim that the practices he seeks to engage in are essential to the practice of his religion.

---

[9]ReligiousTolerance.org estimates that Taoism has about 20 million followers worldwide only 30,000 of which live in North America. See http://www.religioustolerance.org/taoism.htm.

13

A fundamental aspect of Adams' claim is that he desires to be free from any limitations imposed by the prison with respect to the number of religious articles he requires, or with respect to the definitions of Taoist religious ceremonies or festivals. "Religious observances need not be uniform to merit the protection of the first amendment." Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 715 (1981). But the law does not require NCF to permit Adams to have any religious article, ceremony or festival as he, and he alone, sees fit. See Africa, 662 F.2d at 1031 (finding that the concept of ordered liberty precludes allowing any single person a blanket privilege "to make his own standards of conduct in which society as a whole has important interests.") quoting Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). Rather, the law requires NCF to allow Adams a reasonable opportunity to exercise his religion comparable to the opportunity afforded to other inmates. Cruz v. Beto, 405 U.S. at 322. Adams has not demonstrated that he is being deprived of any specific practices that he has demonstrated are essential to the practice of religious Taoism.

While certain questions in the Chaplain's religious

14

questionnaire may be inapplicable to the Taoist group,[10] prison officials unfamiliar with the practices of a particular religion must be given some latitude to determine its legitimacy.  See O'Lone, 482 U.S. at 352 (finding that the courts should not substitute its judgment for that of prison administrators even on claims involving difficult and sensitive matters of institutional administration); see also, Frazee v. Ill. Dept. of Employment Sec., 489 U.S. 829, 833 (1989) ("States are clearly entitled to assure themselves that there is ample predicate for invoking the Free Exercise Clause.").  Following the injunction hearing, Adams submitted as exhibits several pages from Internet websites discussing various Taoist religious practices.  See Pl. Ex. O-S.  There is no evidence that Adams provided this information to NCF prior to the hearing.[11]

---

[10]For example, the questions pertaining to the "head" of the faith group in the United States and to the U.S. headquarters may assume the existence of entities that do not exist.  The absence of such entities, however, would not necessarily mean that Taoism is not a religion.  See generally Torcaso v. Watkins, 367 U.S. 488, 495 (1961) (recognizing Taoism as a religion); Kalka v. Hawk, 215 F.3d 90, 99 (D.C. Cir. 2000) (same); Eduardo Penalver, The Concept of Religion, 107 Yale L. J. 791, 795 (1997) (discussing the lack of a constitutional definition of the term "religion," and highlighting the problem of western bias).

[11]I note that Adams contends that he relied on materials submitted to the Chaplain and NCF by inmate Travis Richardson, whom Adams contends was appointed the representative of the

There is plenty of evidence that NCF is providing Adams opportunities to practice his religion. Taoist inmates at NCF have been scheduled for two to four hours of meeting time per week since the group was first recognized. Def. Ex. 1. The group meetings were briefly suspended over concern that the group was practicing martial arts, but subject to a restriction on physical contact the group was permitted to keep meeting. The amount of group time permitted to Taoists is comparable to other religious groups. Adams argued at the injunction hearing that the Christians are permitted many more hours of meeting time per week. Based upon my review of the Chapel Schedule, however, it is clear that Adams fails to differentiate between the various sects within the Christian faith. It is readily apparent that the time allocated for the Jehovah Witnesses group, the Catholic group, and the Spanish Bible group, for example, should not all be counted together because the inmates within those various groups have different religious needs.

---

Taoist group because NCF did not want to respond to inquiries from multiple inmates. This is Adams' lawsuit, however, and he has not submitted to this Court the evidence of any specific religious practices or articles that Richardson demonstrated to NCF are essential to the practice of religious Taoism.

16

Susan Young, the NCF Administrator programs, testified that NCF plays no role in how the Taoists use their meeting time. The inmates themselves chose the name "Taoist Study Group" for the Chapel Schedule. Inmates are permitted to bow, kneel on mats, perform moving meditation, and read religious literature as they see fit during their time.

The evidence showed that Chaplain Smith inquired of nine Taoist organizations regarding items necessary to practice religious Taoism. Def. Ex. 9. In his letters, Chaplain Smith wrote, "Property [at NHDOC] is strictly controlled. I was wondering if you could give me an idea of what items may be necessary to conduct group religious meetings, and what religious items would a Taoist need to keep in their cell?" Id. Only three organizations responded. Each provided a different answer. Def. Ex. 10. One individual stated that some basic items included candles, incense, a gong or bowl with a wooden clapper, a text of the Tao Te Ching or other text of Taoist sages. Another stated that the inmates would need an altar with three statues representing air, earth and water. A third individual stated that no implements were necessary.

Chaplain Smith testified that he proposed approving for

17

temple practice for the Taoists an altar with three statues, as recommended by one of the outside individuals who responded to his inquiry. The group found this unacceptable. Rather than accepting items that have been substantiated and working to substantiate the need for others, the members of the Taoist group have taken an all or nothing approach that has left them completely unsatisfied.

NHDOC policy requires that religious services be conducted by the Chaplain or an approved religious volunteer. See NHDOC PPD 7.17, V(C). Chaplain Smith testified that he attempted to locate a volunteer for the Taoist group, but one individual identified by the inmates, Dennis Furry, declined. Chaplain Smith also testified that the prison refused to allow Tay Boon Hoe, a Taoist master in the United States on a temporary visa from Singapore, to be an NCF volunteer because he violated the NHDOC Rules for Volunteers. Def. Ex. 7.[12] I find, based on my review of the evidence, that NCF has provided Adams reasonable opportunities to practice his religion.

---

[12]In particular, NCF found that Tay Boon Hoe provided false information on his application, lives in Adams' mother's household, had prohibited phone contact with inmates after being warned against it, and accepted money from inmate Travis Richardson.

18

## 2. Tai Chi

A specific religious practice that Adams seeks to engage in is Tai Chi. Adams complains that his practice of moving meditation has been stunted by the NCF correctional officers. I take judicial notice that Tai Chi is practiced in virtually every park in every Chinatown in the United States, and is practiced in particular by older people for health reasons. But it is also clear from the evidence, including that submitted by Adams, that Tai Chi has martial arts applications. See Pl. Ex. K.

The evidence at the hearing established that, for security reasons, the prison prohibits any form of activity that would require face-to-face confrontation between inmates, which the prison refers to as "facing off." This would include delivering blows, kicks, physical contact, or any offensive or defensive maneuver to an opponent. In October 2001, NCF halted the meetings of the Taoist group because the correctional officers were concerned that the inmates were practicing martial arts moves. The group meetings were allowed to resume when the restrictions were clarified to the group and to the staff.

The undisputed evidence shows that NCF now allows breathing exercises and meditation involving physical movement so long as

19

the participants comply with the restrictions.  See Pl. Ex. CC.
Adams contends that the NCF clarification on Tai Chi needs
further clarification in order to avoid further disputes between
Taoists and correctional officers.

I find that the prison has articulated a reasonable
penological interest for its restrictions on Tai Chi.  Adams is
free to work within the prison's administrative process to
propose reasonable clarifications to the Tai Chi policy.[13]

3.    Religious Articles

Property is strictly controlled at NCF.  See NHDOC PPD 9.2.
The prison puts limits on the types and amounts of property that
prisoners may have to control contraband, minimize conflicts
between inmates over particular items, promote cleanliness and
eliminate fire hazards.  Prisoners are provided Religious
Property Cards that indicate approval for prisoner's possession
of property deemed essential to the religious practice.  See Def.
Ex. 13.  Adams argues that NCF discriminates against the Taoists

_____

[13]Adams also identified "sexual alchemy" as a specific
religious practice he sought to engage in.  Adams did not define
the specifics of the practice, but he did testify that it
requires a partner of opposite sex.  See Pl. Ex. D, G.  Susan
Young testified that to the extent that "sexual alchemy" involves
physical sexual contact, the practice would violate the prison's
regulations restricting physical contact during inmate visits.

20

because he is not permitted to have certain religious items that are similar to items permitted to members of other religious groups.

The evidence at the injunction hearing showed that as of May 7, 2001, the following five items have been approved for personal use for Taoists at NCF: one religious medallion; one set of Malas (prayer beads); one set of Boading Balls; one meditation journal; and one meditation bag. Def. Ex. 5, 13. Taoists may order and possess religious literature and cassette tapes pursuant to the NHDOC PPD 9.2, subject to limitations on the property.

Chaplain Smith testified that he looks for generally accepted practices in determining what religious items are approved for each religious group. The evidence showed that the number of religious articles permitted to Taoists is similar to most other religious groups, with the exception of the Neo-Pagan group. That group is permitted to possess thirteen different religious articles. Chaplain Smith explained this discrepancy by stating that the pagan group has been in existence for eight or nine years and has had a particularly active leader who has been able to substantiate the need for the religious items. It is undisputed that the Taoist group at NCF was not established until

21

April 2001 at the earliest. See Def. Ex. 8.

Chaplain Smith testified that a prisoner is not permitted to retain religious articles from faiths other than their own. I find the prison's policy with respect to possession of religious items reasonable. If it were otherwise, a prisoner could place an undue burden of prison resources. While I agree with Adams' contention that the law does not permit NCF to arbitrarily limit him to five religious items, he has not shown that he was denied permission to obtain religious items that he has substantiated are essential to religious Taoism.

4. Religious Diet

Adams complains that he is being denied a religious diet consistent with his Taoist beliefs. See generally NHDOC 7.1 (establishing the policy and procedure for medical and religious diets). Adams testified at the injunction hearing that his religion prohibits him from eating beef, pork, fish, poultry, or eggs. He claims that he should be provided wheats, oats, barley, millet, rice, seeds, and vegetables. Adams submitted a page from the book Eating in the Light in support of his claim. See Pl. Ex. B. The evidence at the hearing showed that NCF has provided Adams a vegetarian-no egg diet since June 29, 2001. Def. Ex. 6,

22

12. This diet does not require Adams to eat anything that is contrary to his beliefs. To the extent that Adams complains about the specific portions of grains or vegetables that he receives, I find that his complaint is without merit. The evidence at the injunction hearing further showed that, contrary to Adams' contention, he has neither been required to eat holiday meals that are prepared for members of other religious faiths, nor has he identified and substantiated any Taoist special meal days. I find that no injunction is warranted based on Adams' complaint about the food he receives at NCF.

5. Shaving Pass

The prison limits inmates' growth of facial hair based on contraband control and concern pertaining to alteration of physical appearance in the event of escape. However, the prison issues shaving passes, which are exemptions from the regular facial requirements, for religious participants if their religion requires it. Adams complains that NCF has denied his request for a shaving pass, but has permitted passes to Muslim inmates. He seeks an exemption because he argues that shaving is not natural to his essential being. Chaplain Smith testified that NCF denied Adams' request because Adams did not show that facial hair is

required or central to religious Taoism.  Adams has not presented any evidence to the contrary.  I find, therefore, that no injunction is warranted based on this allegation.

II.  Irreparable Harm

In order to be entitled to a preliminary injunction, Adams must demonstrate that he is likely to suffer irreparable harm absent relief.  Irreparable harm is a substantial injury that is not accurately measurable or adequately compensable by money damages.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18-19 (1st Cir. 1996); Auburn News Co., supra, 659 F.2d at 277; Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991).  "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm."  Sierra Club, 769 F. Supp. at 422 (citing Massachusetts Coalition, supra, 649 F.2d at 74).

With respect to the irreparable harm requirement, Adams argues that he has been unable to conduct any religious services, celebrations, initiations, or festival days and that these deprivations are continuing.  The evidence showed that Taoists are being scheduled Chapel time in the same amounts as other religious groups.  The defendants take no role in the

24

determination of how Taoists use their scheduled time.  To the extent that Adams claims that he cannot properly practice his religion without certain articles, he has not demonstrated that he provided outside verification to Chaplain Smith that shows that the items are essential to his religion.  Chaplain Smith indicated at the injunction hearing that he is willing to consider any materials or reference sources that Adams may to provide.  Accordingly, I find that Adams has not demonstrated that he will suffer irreparable harm absent injunctive relief.

Since I have found that Adams neither demonstrated that he is likely to succeed on the merits, nor that he is likely to suffer irreparable harm absent relief, I do not consider the remaining preliminary injunction factors.

III. <u>Motion for a Protective Order</u>

I recommend that Adams' request for a protective order be denied as the evidence he provided at the injunction hearing does not establish that a protective order is warranted.  Adams submitted documentary evidence after the injunction hearing to support his allegation that NCF has retaliated against him for filing this lawsuit by firing him from his position as a law clerk.  Adams states in an affidavit he submitted in support of

25

his motion that "Angela Rouleau did terminate my employment as the NCF Law Clerk for B-Shift by placing me on Reduced pay status ("RPS") for alleged disrespect to staff and for allegedly socializing." No evidence has been presented by the defendants to rebut Adams' allegation. While Adams may have a cognizable retaliation claim, I find that he has not presented sufficient evidence that he is likely to suffer future harm absent relief.

<u>CONCLUSION</u>

For the reasons set forth above, I recommend that Adams' request for interim injunctive relief and for a protective order be denied.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. <u>See</u> <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

 

_____
James R. Muirhead
United States Magistrate Judge

Date: December 18, 2002

cc:     Marc Richard Adams, _pro_ _se_.
        Nancy J. Smith, Esq.